COMMONWEALTH *vs.* ROGER M. MAMAY.

Middlesex. February 8, 1990. - May 15, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Rape. Indecent Assault and Battery. Practice, Criminal*, Trial of indictments together, Duplicative convictions, Continuance, Assistance of counsel. *Insanity. Witness*, Expert. *Evidence*, Expert opinion. *Constitutional Law*, Assistance of counsel.

Six indictments charging a physician with sexual crimes involving female patients visiting his office were properly joined for trial. [416-418]

Where the evidence at a criminal trial would have permitted the jury, under proper instructions, to convict the defendant of both indecent assault and battery and rape on the basis of his acts committed upon one victim, the lack of an instruction to the jury that each conviction must be based on separate acts, to which no objection was taken, presented no substantial risk of a miscarriage of justice. [418-419]

A judge did not abuse his discretion in denying a criminal defendant's motions for continuance. [419-421]

At the trial of a physician charged with sexual crimes upon female patients visiting his office, the judge acted within his discretion in permitting a witness, who was qualified as an expert in the field of rape and sexual assault syndrome, to testify that medical science recognizes the syndrome, that it extends to cases of indecent assault and battery, that not all victims of a rape or indecent assault will report the event immediately, and that, in the context of a trust relationship, some victims may return to the relationsip for further contact with the perpetrator of the assault. [421-422] LIACOS, C.J., concurring.

A criminal defendant made no showing that his trial counsel was ineffective under the standard articulated by this court in *Commonwealth* v, *Saferian*, 366 Mass. 89, 96 (1974). [423-425]

INDICTMENTS found and returned in the Superior Court Department on December 4, 1984.

The cases were tried before *Robert A. Barton*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Bernard Grossberg* for the defendant.

*Michael Fabbri*, Assistant District Attorney, for the Commonwealth.

NOLAN, J. A jury convicted the defendant on four indictments charging indecent assault and battery and one indictment charging rape.[1] The defendant appealed. We transferred the case to this court on our own motion, and we now affirm.

On December 4, 1984, a Middlesex County grand jury returned nine indictments against the defendant. After pleading not guilty to all the offenses charged, the defendant filed a motion for relief from prejudicial joinder. The Commonwealth moved for joinder of six of the indictments which it claimed were related. Each alleged an indecent assault and battery or rape by the defendant doctor upon a female patient in his office. The trial judge allowed the Commonwealth's motion and denied the defendant's motion.

At trial, the victims all testified.[2] Victim A testified that she was twenty-three years old when she first saw the defendant on January 5, 1984. After conducting an examination of Victim A, the defendant asked her to step into an adjoining office. In the adjoining office the defendant asked Victim A whether she could cook, whether she "pleased" her boy friend, and how often she had sex with her boy friend. The defendant instructed Victim A to refrain from sex and to schedule another appointment. On January 10, 1984, Victim A returned to the defendant's office, and he once again asked her questions regarding her sex life. On January 24, Victim A returned for a third visit. At this time, the defendant again asked Victim A whether she knew how to "please a man" and asked whether she would "please him." The defendant then approached Victim A and began to rub his pelvic area against her, all the while continuing to ask her to please him. Victim A sat down, frightened. The defendant then took Vic-

---

[1] The defendant was acquitted on one indictment charging indecent assault and battery.

[2] We shall refer to the victims as Victim A, Victim B, etc.

tim A's arm and placed her hand on his zipper. Victim A pulled her hand away and said "No." A nurse then opened the door and told the defendant that there were several patients waiting. The defendant instructed Victim A to return. She scheduled an appointment but did not return. On January 27, 1984, Victim A told her boy friend of the defendant's acts. The boy friend testified as a "fresh complaint" witness.

Victim B testified to a gynecological examination the defendant performed on February 16, 1984. While Victim B was lying on the examining table with her legs raised in the "stirrups," the defendant asked her whether she gave her boy friend "head," whether she enjoyed sex, what kind of sex she enjoyed, whether she enjoyed "sixty-nine," and whether she had orgasms when she had sex. Without gloves, the defendant then began an examination by inserting a speculum into Victim B's vagina. After removing the speculum, the defendant inserted two fingers in Victim B's vagina; the defendant was still gloveless. Placing his other hand on the victim's stomach, the defendant began to move his fingers slowly in and out of Victim B's vagina for a period of three or four minutes. After removing his fingers from Victim B's vagina, the defendant examined her breasts by placing himself between her legs and reaching up to her chest. The defendant rubbed his pelvic area against Victim B's pelvic area throughout the breast examination, which lasted three or four minutes. The defendant then attempted to stick his finger (still gloveless) in Victim B's rectum, but stopped when she screamed. On March 8, 1984, Victim B returned to the defendant for an examination that took place without incident. This was the only examination during which a nurse was present. On March 15, 1984, she returned for another visit. On that date, the defendant placed a gloveless finger in Victim B's vagina, he again rubbed his pelvic area against her during a breast examination, and again tried to place his finger in her rectum. March 15 was the date of Victim B's last visit with the defendant. At some time, Victim B told her boy friend of her experiences with the defendant, and he testified as to Victim B's complaint.

Victim C testified that she was seventy-eight years old during the summer of 1984, when she visited the defendant's office. The defendant told Victim C that she looked pretty, and he stuck his tongue in her mouth. The defendant then picked Victim C up, placed her on the examining table and pulled her pants and underwear down. The defendant put his penis into Victim C's rectum. She cried out in pain. The defendant then put his penis into her vagina. The defendant "satisfied" himself. Victim C testified that her pants were bloodied when she returned home and that she told her husband of the rape. The husband testified as a fresh complaint witness and also testified that he saw the bloodied pants.

Victim D testified about an examination on January 30, 1984, during which the defendant put his fingers in her vagina for "at least two minutes." When he removed his fingers he "flicked" her clitoris "three or four times." Victim D noticed that the defendant did not wear gloves. The defendant then began to pinch Victim D's nipples, but he stopped when she told him that it was painful. The defendant then asked Victim D whether she engaged in oral sex, what positions she had sex in, how often she had sex, whether she enjoyed "giving head," and if she would do it to him. Victim D responded, "No way." At a subsequent visit on February 9, 1984, the defendant again asked Victim D a series of questions about her sex life. Suddenly, as Victim D was sitting partially disrobed on the examining table, the defendant pulled her from the table and onto his lap, as he sat on a chair. The defendant put his hand in between Victim D's legs and began rubbing her pelvic area. Victim D got up, dressed, and left. Victim D's boy friend testified as a fresh complaint witness.

The Commonwealth presented two experts. First, Dr. Susan Robinson testified as an expert on obstetrics and gynecology. Dr. Robinson testified that in a normal pelvic examination, a gynecologist would wear gloves, would avoid touching the clitoris, and would have his finger inside the patient's vagina for no more than thirty seconds to one minute. In a normal breast examination if the patient is lying down, Dr.

Robinson testified that the doctor would stand to the side of the patient, not between her legs. Dr. Robinson, in response to a series of hypothetical questions, opined that a doctor who did not wear gloves during a vaginal inspection, who plunged his fingers in and out of a vagina for from three to five minutes, who rubbed his crotch area against the patient's crotch area during a breast examination, and who "flicked" a patient's clitoris three or four times, would not be acting in the usual course of his professional practice for a legitimate medical purpose. The Commonwealth also presented Ann W. Burgess, whom the court qualified as an expert in the field of rape and sexual assault syndrome (or "rape trauma syndrome"). She had conducted a study of the behavior of rape victims.

The jury convicted the defendant of indecent assault and battery on Victim A, Victim B, Victim C, and Victim D. The jury also convicted the defendant of rape of Victim C. The defendant raises a number of issues on appeal.

1. *Joinder.* The defendant argues that joinder of the six indictments for trial was improper. Joinder is governed by Mass. R. Crim. P. 9, 378 Mass. 859 (1979). Rule 9 (a) (3) provides that, upon motion, a trial judge shall join related offenses for trial unless joinder is not in the best interests of justice. Rule 9 provides that two or more offenses are "related" when "they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Joinder is a matter to be resolved by the trial judge in his discretion. *Commonwealth* v. *Hoppin*, 387 Mass. 25, 32 (1982).

Each of the six indictments joined for trial in this case involved allegations of criminal sexual conduct. Each victim was a patient of the defendant. Each incident took place in the defendant's office during the course of medical treatment. These offenses were a series of criminal episodes which were part of a scheme whereby the defendant used his position of authority and trust to commit sexual crimes upon the female patients visiting his office. See *Commonwealth* v. *Pope*, 392

Mass. 493, 502-503 (1984) (sexual offenses which took place in same hotel involving different victims properly joined). The defendant argues that the offenses occurred over an eight-month period and each involved different facts. Where, as here, there is such a similarity in the *method* by which the defendant committed the various offenses, we think that an eight-month time period does not make the offenses unrelated. The offenses all took place at the same location, and the defendant used the same "scheme" in each case. The slight factual variations in each case are not controlling since each charge involved a sexual offense in the doctor's office when the patient submitted herself to the doctor for a medical examination. In short, joinder was permissible under the standards of rule 9.

In addition to applying the "technical requirements" of rule 9, however, the judge must "decide the question in the context of the guarantee of a fair trial for every defendant." *Commonwealth* v. *Sylvester*, 388 Mass. 749, 758 (1983). In particular, the propriety of joining any one of the six indictments turns, in large measure, on whether evidence of the other five offenses would have been admissible at a separate trial on each indictment. *Commonwealth* v. *Gallison*, 383 Mass. 659, 672 (1981). It is settled that evidence of other criminal conduct is inadmissible to prove the propensity of the defendant to commit the indicted offense. *Id.* Such evidence can be used, however, to "show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). In *Commonwealth* v. *King*, 387 Mass. 464, 469-473 (1982), we discussed the admissibility of other crime evidence to show a pattern or course of conduct. *King* is controlling here. As noted, the evidence demonstrated a clear pattern of conduct. The judge carefully instructed the jury that, as to each victim, they could not use the testimony of any of the other victims in considering the defendant's guilt. The judge further charged that that evidence could only be used in so far as it was relevant to the defendant's

state of mind, intention, and pattern of conduct. There was no abuse of discretion in the circumstances.[3]

2. *Duplicative convictions*. The defendant was convicted of both rape and indecent assault and battery of Victim C. On appeal, the defendant contends, for the first time, that the two convictions are duplicative. In the circumstances, we review the claim only to determine if a substantial risk of a miscarriage of justice occurred. *Commonwealth* v. *Thomas*, 401 Mass. 109, 119 (1987).

As *Thomas* makes clear, there is a distinction between cases where the indecent assault and battery and the rape are " 'so closely related in fact as to constitute in substance but a single crime,' [and situations where] the indecent assault and battery constituted a separate and incidental act." *Id.* at 120, quoting *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979). Victim C testified that the defendant "tore" down her pants and put his penis into her rectum. When Victim C cried out in pain, the defendant took his penis out of her rectum and put it into her vagina. Victim C also testified that the defendant inserted his tongue into her mouth. There is evidence of two distinct acts of rape and one act of indecent assault and battery in this scenario. Thus, the indecent assault and battery could have been held to constitute a wholly separate act and not a lesser included offense. In *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381-382 (1989), a case analogous to the instant case, we held that the indecent assault and battery conviction had to be reversed. In *Sanchez*, however, "[t]he Commonwealth [did] not argue . . . that it was a wholly separate act." *Id.* at 381. Here, the prosecutor consistently highlighted the different actions of the defendant. If the defendant had requested an instruction that each conviction must be based on separate acts, or had objected to the lack of such an instruction, we might reverse the conviction of the lesser-included offense. *Commonwealth*

---

[3]In his brief, the defendant asserts that the joinder of the six indictments denied him due process of law under the State and Federal Constitutions. Since neither constitutional issue was argued below, we deem the argument to be waived. *Commonwealth* v. *Owens*, 402 Mass. 639, 641 (1988).

v. *Thomas,* 400 Mass. 676, 680-682 (1987). On this record, however, we are only charged with determining whether there is a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Thomas,* 401 Mass. 109, 119 (1987). In view of Victim C's testimony (credited by the jury) as to two distinct acts, and the Commonwealth's consistent reliance on more than one act, we conclude that, in the circumstances of this case, there is no substantial risk of a miscarriage of justice. Both convictions should stand.

3. *Denial of continuances.* In late February, 1985, the defendant obtained the services of a new attorney. The trial date was changed from March 4, 1985, to July 8, 1985. On July 1, 2, and 3, defense counsel filed a series of motions seeking a continuance. Defense counsel wanted time for a psychiatric evaluation of the defendant and argued that information he received from the assistant district attorney on June 27, 1985, suggested for the first time the possibility of an insanity defense. The judge denied the defendant's motions. However, the judge did order an evaluation of the defendant by a court psychiatrist, who reported that the defendant was competent to stand trial.

On July 5, 1985, the judge ordered that the defendant be committed to Bridgewater State Hospital pursuant to G. L. c. 123, § 15 (*b*) (1988 ed.). A psychiatrist there reported that the defendant was, in his opinion, competent to stand trial. In addition, the physician reported that there was insufficient evidence to lead him to conclude that the defendant lacked criminal responsibility. The reports indicated, however, that the defendant showed signs of long-term psychological difficulties. Based on these new reports, the defendant again sought a continuance to allow the defense to conduct its own psychiatric evaluations. The judge denied the defendant's motion, and trial began on August 5, 1985.

"Ordinarily, the granting of a continuance rests in the sound discretion of the trial judge, and a denial of a continuance will not constitute error absent an abuse of that discretion." *Commonwealth* v. *Cavanaugh,* 371 Mass. 46, 50-51 (1976). "In considering a request for a continuance, a trial

judge should balance the movant's need for additional time against the possible inconvenience, increased costs, and prejudice which may be incurred by the opposing party if the motion is granted. He must also give due weight to the interest of the judicial system in avoiding delays which would not measurably contribute to the resolution of a particular controversy." *Commonwealth* v. *Gilchrest*, 364 Mass. 272, 276-277 (1973).

A defendant has a right to place before a jury any evidence which is probative of his mental condition. *Commonwealth* v. *Louraine*, 390 Mass. 28, 34 (1983). Thus, a defendant must be given a fair opportunity to marshal an insanity defense. Here the defendant obtained new counsel in February of 1985, the trial was not scheduled to begin until July 8, 1985, and did not, in fact, begin until August 5, 1985. Even assuming that defense counsel had no grounds for considering an insanity defense prior to June 27, 1985 (when he received certain discovery materials from the assistant district attorney), he still had time to investigate such a defense. This is true because the defendant had been seeing a privately retained psychologist since February of 1985.[4] In other words, the pieces were in place, and counsel had had a reasonable time to draw them together. Moreover, the judge delayed trial when he ordered the defendant to Bridgewater State Hospital for evaluation. There was no showing that, during this additional month, the defendant could not have obtained an independent psychiatric examination.

The judge was faced with a motion seeking to delay a trial which had already been significantly delayed, when the defendant obtained new counsel. Two court-ordered evaluations indicated that the defendant was competent to stand trial. One physician indicated that there was insufficient evidence to lead him to conclude that the defendant lacked criminal responsibility. Considering these countervailing factors, the circumstances the defendant presented did not require a de-

---

[4] In fact, this psychologist testified on July 3, in connection with one of the defendant's motions seeking a continuance.

lay in the trial. There was no abuse of discretion in denying a continuance.

4. *Expert testimony*. The defendant argues that it was improper to admit the testimony of Ann W. Burgess, who was qualified as an expert in the field of rape and sexual assault syndrome. A trial judge has broad discretion with respect to the admissibility of expert testimony. *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989). Expert testimony "is admissible if, in the judge's discretion, the subject is not within the common knowledge or common experience of the jury." *Commonwealth* v. *Francis*, 390 Mass. 89, 98 (1983).

Burgess testified that not all victims of rape and sexual assault will report the event immediately. Often the first person they will tell is someone close to them. Burgess also said that, in the context of a trust relationship, such as a doctor-patient relationship, some victims may return to the trusted relationship for further contact with the perpetrator of the assault. Burgess's testimony did not relate to the victims in this case. It was simply testimony relating to rape and sexual assault syndrome generally. See *Commonwealth* v. *Dockham*, *supra* at 627-630. See also *Terrio* v. *McDonough*, 16 Mass. App. Ct. 163, 175-176 (1983). It was within the judge's discretion properly to conclude that it was beyond the jury's common knowledge to know why a victim would return to a situation in which she had been sexually assaulted or raped.

The defendant contends that there is a lack of scientific evidence (1) that rape trauma syndrome, so called, occurs in cases of mere indecent assault and battery, or (2) that the syndrome occurs in trust relationships. Burgess testified, based on her extensive studies in the area of rape trauma syndrome, that medical science recognizes the syndrome and that it extends to victims of "nonconsensual sexual assault." A number of other courts and commentators, see *Commonwealth* v. *Mendes*, 406 Mass. 201, 205 (1989) (in determining validity of scientific method, court may look to opinions of other courts), have recognized the scientific basis of rape trauma syndrome. See *State* v. *Huey*, 145 Ariz. 59, 62-64 (1985); *People* v. *Hampton*, 746 P.2d 947, 949-953 (Colo.

1987); *Simmons v. State*, 504 N.E.2d 575, 578-579 (Ind. 1987); *State v. Marks*, 231 Kan. 645, 655 (1982); *People v. Taylor*, 75 N.Y.2d 277 (1990); *State v. Liddell*, 211 Mont. 180 (1984); *State v. McCoy*, 366 S.E.2d 731, 736-737 (W. Va. 1988); Buchele & Buchele, Legal and Psychological Issues in the Use of Expert Testimony on Rape Trauma Syndrome, 25 Washburn L.J. 26 (1985); Cling, Rape Trauma Syndrome: Medical Evidence of Nonconsent, 35 Med. Trial Tech. Q. 154 (1988); Note, "Rape Trauma Syndrome" and Inconsistent Rulings on Its Admissibility Around the Nation: Should the Washington Supreme Court Reconsider its Position in *State v. Black*?, 24 Willamette L. Rev. 1011 (1988); Note, Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings, 70 Va. L. Rev. 1657 (1984). The Commonwealth submitted two articles to the trial judge: Burgess, Physician Sexual Misconduct and Patients' Responses, 138 Am. J. Psychiatry 1335 (Oct. 1981), and Burgess & Holmstrom, Rape Trauma Syndrome, 131 Am. J. Psychiatry 981 (Sept. 1984). The witness, Ann W. Burgess, was the author of the former and coauthor of the latter. Burgess testified on voir dire that she was currently working on a book relating to "sexual misconduct by health professionals." Thus, there was a clear basis from which the judge could conclude that the medical community has generally recognized the existence of rape trauma syndrome. Burgess's expert opinion as to who generally is affected by the syndrome and the extent of the syndrome in the context of a trust relationship was based on her professional knowledge and experience and was clearly permissible. There was no abuse of discretion.[5]

_____

[5]The argument that introduction of Burgess's curriculum vitae and Burgess's testimony itself denied the defendant his confrontation rights is meritless in the circumstances. Not only did the defendant not object on these grounds below, but the judge gave the jury proper limiting instructions on the use of expert testimony and the use of the curriculum vitae in determining the expert's qualifications. Moreover, the defendant had a full opportunity to cross-examine Burgess.

5. *Ineffective assistance of counsel.* The defendant argues that he was denied effective assistance of defense counsel (defendant is represented by other counsel on appeal). In *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974), we said that, in order to prevail on such an argument, the defendant must show that "there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." The defendant points to the failure of his defense counsel to marshal an insanity defense, the trial performance of counsel, and the conduct of counsel at the sentencing hearing.

As noted earlier, there was some indication that an investigation of an insanity defense might have been fruitful. Rather than following up on this theory, defense counsel proceeded with a different defense theory: that no crimes occurred. Thus, the defendant testified that, although he indeed examined all the victims, he did nothing except what was medically required. He attempted to explain each event by offering explanations that the acts which occurred were harmless. Counsel called other witnesses to support the defendant's stories and attempted to discredit the testimony of the victims. Since a concurrent argument that the defendant lacked criminal responsibility due to insanity might have severely weakened the tactics actually utilized by the defense, counsel most likely decided not to pursue the insanity defense. See *Commonwealth* v. *Genius,* 387 Mass. 695, 697 (1982) (tactical decision to forgo insanity defense not ineffective assistance). In light of the fact that a court-ordered evaluation of the defendant resulted in a report indicating that there was insufficient evidence to determine that the defendant lacked criminal responsibility, counsel's tactical choice seems all the more wise. In any event, the defendant has not made a showing that the insanity defense would have

been a "substantial ground of defence." *Commonwealth* v. *Saferian, supra* at 96.

The defendant contends that counsel's performance at trial was incompetent. He cites a number of instances which, he argues, compel this conclusion. The defendant points to trial counsel's untimely motion to strike Burgess's testimony. The error was harmless since we have held that the testimony was properly admitted. Next, the defendant charges that counsel seriously erred in causing one of the victim-witnesses to cry during cross-examination. Not only is such an occurrence unforeseeable, but vigorous cross-examination was a necessary element of the defendant's trial strategy which amounted to discrediting the victims and explaining away their testimony. The defendant argues that his attorney's failure to call a van driver (who chauffeured Victim C), a medic, certain experts, and the patients who saw Dr. Mamay before and after the victims, was incompetence. The defendant offers no evidence to show that these persons would have aided his defense. Indeed, the fact that counsel did not call them as witnesses, when he was aware of who they were (several of the names appeared on his pretrial witness list) suggests that he determined that their testimony might not be helpful. See *Commonwealth* v. *Thomas*, 399 Mass. 165, 169 (1987).

The defendant also claims his attorney should have objected a number of times when he did not, particularly during the prosecutor's closing argument. In our view, the prosecutor's closing argument was largely unobjectionable. The prosecutor properly argued in support of the credibility of the Commonwealth's witnesses, see *Commonwealth* v. *Sanchez*, 405 Mass. 369, 377 (1989), and did not interject his personal belief as to their credibility or rely on facts not in evidence. The prosecutor's conclusion, in which he said, "And I ask you, I ask you, and you, and you . . . [repeatedly] . . . to find Roger Mamay guilty" was not improper. The mere use of a first person pronoun does not interject personal belief into a statement. The prosecutor was simply arguing that the jury should find the defendant guilty. See *Commonwealth* v. *Smith*, 387 Mass. 900, 906-907 (1983). The defendant's con-

tention that his attorney should have objected to the prosecutor's arguments is meritless.

The defendant cites numerous other instances where his attorney should have objected or moved to strike testimony. His contentions are largely without merit. We have reviewed the record and are convinced that counsel's trial performance was not "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth v. Saferian, supra.*

Finally, the defendant argues that his attorney's presentation at the sentencing hearing was inadequate. At sentencing, counsel's argument was brief and singular in theme. Immediately prior to sentencing, however, counsel argued in support of motions he had filed under G. L. c. 123, § 15 (*e*) (1988 ed.) (evaluation in aid of sentencing), and G. L. c. 123A, § 4 (1988 ed.) (sexually dangerous persons). During the lengthy arguments on those motions, counsel presented a number of considerations which would have been redundant if presented again in the sentencing hearing immediately following. Thus, the judge was exposed to a number of potential mitigating factors. In this context, counsel's performance at the sentencing was not ineffective. *Commonwealth v. Lykus*, 406 Mass. 135, 145-146 (1989), is distinguishable since, in that case, counsel failed altogether to bring any mitigating factors to the judge's attention. Here, counsel did so in his motion arguments mentioned above. In any event, in *Lykus* the defendant argued that counsel should have brought up the defendant's employment history, his charitable activities, and his civic contributions. If the court had considered those factors, Lykus argued, the sentence probably would have been more favorable. Here, Mamay has failed to bring to our attention any redeeming attributes which could have been raised by counsel. In the absence of a showing that a different result might have been attained, we cannot say that counsel's performance was ineffective.

*Judgments affirmed.*

LIACOS, C.J. (concurring). I write separately to express my concern regarding two aspects of the majority opinion's treatment of the expert testimony on the characteristics of rape trauma syndrome. These concerns are reflected in the defendant's contentions on appeal that there is a lack of scientific evidence that rape trauma syndrome occurs either in cases of indecent assault and battery or in situations involving a "trust relationship." In response to these arguments, the majority relies primarily on the citation of several scholarly articles and numerous decisions of other courts in which the scientific basis of rape trauma syndrome has been recognized. *Ante* at 422. In my view, this citation of articles and cases is not responsive to the specific issues raised by the defendant's arguments.

While it is true that the cases cited by the majority affirm the scientific basis of rape trauma syndrome, most of these cases involve the admissibility of such testimony in the context of a trial of an indictment for rape. See *People* v. *Hampton*, 746 P.2d 947 (Colo. 1987) (first-degree sexual assault conviction upheld); *Simmons* v. *State*, 504 N.E.2d 575 (Ind. 1987) (rape conviction upheld); *State* v. *Marks*, 231 Kan. 645 (1982) (rape conviction upheld); *People* v. *Taylor*, 75 N.Y.2d 277 (1990) (convictions of rape, sodomy, and sexual abuse of the same victim upheld); *State* v. *Liddell*, 211 Mont. 180 (1984) (conviction for "sexual intercourse without consent" upheld). The present case, however, involves the admissibility of rape trauma syndrome testimony in the context of a trial for indecent sexual assault and battery involving several different victims, as well as the rape of one victim. There appears to be a lack of congruity between the cited cases and the conclusion that rape trauma syndrome testimony may be admitted for the purposes of proving indecent assault and battery. Nevertheless, because both types of crimes involve a degree of force which could be expected to produce similar reactions on the part of victims, I believe that the judge below acted within his "broad discretion" to admit the expert testimony for both indecent assault and bat-

tery and rape. *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989).

I find myself somewhat more troubled by the issue of the scientific basis for the expert testimony regarding the behavior of sexual assault victims involved in a "trust relationship." *Ante* at 421. This testimony represented a crucial component of the prosecution's case, in that it provided an explanation as to why a sexual assault victim might return voluntarily to visit her attacker. However, because the defendant failed to focus his objection on the expert's competence to testify on the effect of a "trust relationship" on the victims, I am unwilling to declare that the judge below erred in allowing this testimony to go to the jury. For the purposes of future cases, I express my views regarding the adequacy of the evidence referred to by the court in its conclusion that a scientific basis exists for such testimony. *Ante* at 421.

The expert witness, Ann Burgess, testified that the present case was the first in which she had been qualified as an expert in the field of rape trauma syndrome within a trust relationship. None of the cases cited by the court involves the issue of the scientific basis of trust relationship testimony. Furthermore, of all the scholarly articles mentioned in the court's opinion, only one discusses the behavioral characteristics of victims who have been sexually assaulted in a trust relationship. That article, Physician Sexual Misconduct and Patients' Responses, 138 Am. J. Psychiatry 1335 (1981), was written by the expert witness in the present case and draws its conclusions from a study of sixteen patients who had been sexually assaulted by the same physician. I consider the empirical basis of this study to be insufficient to support the conclusion that "the medical community has generally recognized the existence of rape trauma syndrome" within a trust relationship. I hope that, in future cases, trial judges and prosecutors will take particular care to ensure that expert testimony is based on a solid, scientific foundation.