## COMMONWEALTH *vs.* TERRY GRAY.

Suffolk. October 5, 2012. - June 5, 2013.

Present: IRELAND, C.J., SPINA, CORDY, DUFFLY, & LENK, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Constitutional Law,* Severability, Search and seizure, Jury. *Evidence,* Scientific test, Argument by prosecutor. *Practice, Criminal,* Severance, Jury and jurors, Voir dire, Instructions to jury, Argument by prosecutor, Motion to suppress, Capital case. *Search and Seizure,* Consent, Protective sweep, Inevitable discovery. *Jury and Jurors. Deoxyribonucleic Acid.*

There was no abuse of discretion in the denial of a criminal defendant's motion to sever two indictments charging murder in the first degree of his uncle and his stepfather, and an indictment charging assault and battery by means of a dangerous weapon of another uncle, where the judge properly could have found that the three incidents giving rise to the indictments were related, and where the defendant failed to satisfy his burden of proving that the joinder resulted in compelling prejudice. [334-337]

At a criminal trial, the judge did not abuse his discretion by asking potential jurors whether the absence of scientific evidence would prevent them from fairly evaluating the evidence introduced at trial, where the question posed suggested to potential jurors that they should evaluate fairly the evidence introduced at trial and was tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence, did not commit the jury to a verdict in advance, and did not have the effect of creating a jury comprised only of individuals predisposed to convicting the defendant based solely on the Commonwealth's evidence, without consideration of the scientific evidence the Commonwealth failed to introduce [337-340]; further, there was no abuse of discretion in the judge's further explanations to two jurors during individual voir dire, where the judge's comments did not amount to a command to ignore the lack of scientific evidence [340-341].

At a criminal trial, the defendant was not prejudiced by the prosecutor's comment in closing argument that improperly referenced the judge's voir dire question of potential jurors whether the absence of scientific evidence would prevent them from fairly evaluating the evidence introduced at trial, where, considered in the context of the entire closing, and the manner in which the case was prosecuted, the statement did not amount to argument that the jury should ignore the absence of scientific evidence. [341-342]

A Superior Court judge properly denied a criminal defendant's motion to suppress a box of ammunition seized from the apartment where the defendant and his sister lived with their mother, following a warrantless search that took place after the defendant's arrest, where, although the police could

not, after properly entering the apartment with the consent of the defend-
ant's sister, lawfully remain therein to secure it pending the issuance of a
search warrant absent an indication that there were other people inside,
discovery of the ammunition was inevitable because a valid search warrant
nonetheless would have been issued regardless of the tainted information
(discovered during the initial entry into the apartment) included in the af-
fidavit in support of the application for the warrant, i.e., there was an
independent source for the challenged evidence. [342-347]


INDICTMENTS found and returned in the Superior Court Depart-
ment on September 29, 2005.

A pretrial motion to suppress evidence was heard by *Charles
J. Hely*, J.; a motion for relief from prejudicial joinder was
heard by *Frank M. Gaziano*, J., and the cases were tried before
him.

*David H. Mirsky* for the defendant.

*Allison Callahan*, Assistant District Attorney (*Masai-Maliek
King*, Assistant District Attorney, with her) for the Com-
monwealth.

DUFFLY, J. The defendant was convicted by a Superior Court
jury of murder in the first degree for the shooting of his uncle,
Charlie Wilson, on July 9, 2005; assault and battery by means
of a dangerous weapon of MacArthur Powell, another uncle, on
June 16, 2005; and related firearm and ammunition offenses.[1]
The jury were unable to reach a verdict on indictments charging
the defendant with murder in the first degree of James Gray, the
defendant's stepfather, and with firearm and ammunition charges
related to that offense.[2] The Commonwealth's theory at trial
was that the defendant killed or assaulted the victims because
he believed that each of them had sexually molested him as a
child.

The defendant claims that joinder of the indictment charging
assault and battery by means of a dangerous weapon with the
indictments charging murder in the first degree was unfairly
prejudicial, and that his motion to sever the indictments should
have been allowed. The defendant contends also that questions

---

[1]Because a number of family members share the same last name, we refer
to some of the witnesses and victims by their first names.

[2]The judge declared a mistrial on those charges, and the indictments were
subsequently nol prossed.

the judge asked the venire concerning their ability fairly to evaluate the evidence notwithstanding the absence of physical evidence such as deoxyribonucleic acid (DNA) or fingerprints linking the defendant to the crimes should not have been asked and, in conjunction with the prosecutor's closing argument referencing those questions, suggested to the jury that they could not consider the Commonwealth's failure to produce such evidence or to investigate thoroughly the physical evidence at the crime scenes. In addition, the defendant maintains that his motion to suppress a box of ammunition seized from the kitchen of the apartment where he lived should have been allowed because the ammunition was seized in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution, art. 14 of the Massachusetts Declaration of Rights, and Massachusetts law.

We affirm the convictions and conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce the conviction of murder in the first degree to a lesser degree of guilt or to order a new trial.

*Background.* We summarize the facts the jury could have found, supplemented, where necessary to provide context, by portions of the testimony introduced in the Commonwealth's case-in-chief for the shooting of James.

According to members of the defendant's family, the defendant had come to believe that he had been sexually abused by several male relatives when he was younger; had a mental list of relatives he suspected of that childhood sexual abuse, which included MacArthur, Wilson, and James; and believed that he had been both sexually and physically abused by his stepfather.

On June 16, 2005, the defendant and a cousin went to the home of their uncle, MacArthur. After making small talk for a few minutes, the defendant walked to his uncle's bed, knelt down as if praying, and then got up. The defendant ordered MacArthur to kneel as he had just done, and asked him how he "want[ed] it." The defendant pressed the end of a handgun to MacArthur's head and then left. Initially, MacArthur did not tell the police about the assault.

The defendant's uncle Wilson, who lived alone, had serious health issues and limited mobility. On July 9, at about 9 A.M.,

Wilson spoke by telephone with his visiting nurse, who told Wilson he would come by to visit at 10 A.M. Sometime between 9 A.M. and 10:30 A.M., the defendant visited his uncle, Earlie Powell, who was eating breakfast. After talking for a few minutes, the defendant told his uncle, "I offed Charlie." When Earlie expressed disbelief, the defendant gestured twice, as if firing a gun, and then left. Just before 10 A.M., the visiting nurse knocked on Wilson's door. Receiving no response, the nurse called Wilson using a cellular telephone. He could hear Wilson's telephone ringing inside the apartment, but Wilson did not answer.

Later that day, Earlie told his son, Ujean Warren, what the defendant had said, and the two drove to Wilson's apartment to check on him. Ujean called Wilson from outside the building, but there was no answer. Ujean asked a security guard to locate the building custodian, who accompanied Ujean to the entrance to the apartment. The custodian was "sort of alarmed" to find the door locked, because generally it was left unlocked so that people could check on Wilson. When the men entered the apartment, they found Wilson lying facedown on the bed, with his lower legs extending off the bed and a pillow over his head. Wilson had been shot twice in the head. Spent nine millimeter shell casings were found at the scene.

On July 14, Boston police officers went to James's apartment to interview him about Wilson's death. James did not respond to their knock, but they could hear "loud . . . Latin music" from inside the apartment. When they returned the next day and James still did not answer, the officers requested that building security unlock the door. The air-conditioning was turned up and the inside of the apartment was "freezing"; the television was on with the volume set very high.

Police found James's body face down on the bed, "kind of like on his knees." His head was covered by towels that had been stacked on top of each other and were perforated with what appeared to be bullet holes. His hands were bound together with cords, a cord was wrapped around his legs, and his shorts and underwear were pulled down to his ankles. A necktie was tied over his mouth, and there was a sock inside his mouth. A spent nine millimeter shell casing and a nine millimeter bullet

were recovered from the scene.[3] The sign-in log to James's building for July 12 showed that the defendant had signed in at 7:40 A.M. and that no other visitor had signed in after him to visit James. When asked about the sign-in log, the defendant admitted to police that he had visited James "the other day," saying he had gone up to talk with James and then left. A gold watch with distinctive features was missing from James's apartment; the defendant was seen with that watch on July 12.

After he was arrested, the defendant agreed to give a statement to police.[4] During the interview, he told police that he had recently seen Wilson with children, which bothered him; that James may have done something to him in the past that he could not remember; and that he did remember that James beat him consistently. The defendant also stated that he might have been abused in the past. He said he was telling this to the detective so that it would not happen to other children. The defendant said that his uncle, MacArthur, had at some point "offered up his private parts" to him.

*Discussion.* 1. *Joinder.* The defendant claims that the trial for the assault on MacArthur should not have been joined for trial with the two murder indictments. He claims that the cases were not properly joined because there was "no substantive connection" between the incidents, the murders were distinct in their levels of brutality, and the motive for the assault on MacArthur was "particularized" to that victim. He argues also that joinder was prejudicial because trial of the assault and battery together with either murder "was likely to cause the jury to draw the impermissible conclusion that the defendant had a criminal propensity." Evidence of the assault on MacArthur, he maintains, would have been inadmissible at a severed murder trial because it concerned only a prior bad act, and since that was the only charge for which the prosecution had eyewitness identification, it implicitly strengthened the other two cases and precluded the defense of mistaken identity.

Joinder is governed by Mass. R. Crim. P. 9, 378 Mass. 859

---

[3]James's death was caused by a gunshot wound to the neck and face; blunt trauma to his head, causing a skull fracture and hemorrhaging; and asphyxia with a gag.

[4]The defendant declined to have the statement recorded.

(1979). Rule 9 (a) (3) provides that, where "a defendant is charged with two or more related offenses, either party may move for joinder of such charges," and that joinder "shall" be allowed unless the trial judge "determines that joinder is not in the best interests of justice." "Thus, joinder requires first that the offenses are related, and second that joinder be in the best interests of justice." *Commonwealth* v. *Sullivan*, 436 Mass. 799, 803 (2002). A judge is required to do more than determine whether the explicit requirements for joinder are met, and must "decide the question in the context of the guarantee of a fair trial for every defendant. The determination of what will be in the 'best interests of justice' requires weighing, in each case, the defendant's interests against judicial economy." *Commonwealth* v. *Sylvester*, 388 Mass. 749, 758 (1983). "The propriety of joinder is a matter for the trial judge's discretion." *Commonwealth* v. *Sullivan, supra.* See *Commonwealth* v. *Mamay*, 407 Mass. 412, 416 (1990).

As relevant here, offenses are related "if they . . . arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan." Mass. R. Crim. P. 9 (a) (1). See *Commonwealth* v. *Sylvester, supra* at 755. In this context, offenses are related if "the evidence in its totality shows a common scheme and a pattern of operation that tends to prove" each indictment. *Commonwealth* v. *Feijoo*, 419 Mass. 486, 494 495 (1995). In making the determination whether a series of offenses is related, a judge may consider the factual similarities between the offenses, *Commonwealth* v. *Ferraro*, 424 Mass. 87, 89 91 (1997); whether the offenses were near to each other in time or place, *Commonwealth* v. *Delaney*, 425 Mass. 587, 594 (1997), cert. denied, 522 U.S. 1058 (1998); whether the offenses sprang from the same cause or motivation, see *id.*; and whether evidence of each offense would be admissible in the other trial were the charges to be severed. *Commonwealth* v. *Gallison*, 383 Mass. 659, 672 (1981). See *Commonwealth* v. *Delaney, supra* at 594-595 ("if the charges were tried separately, much testimony would be duplicated at each trial merely establishing the relationship between the victim and the defendant").

Here, the judge properly could have found that the three

incidents were related. The attacks occurred within a thirty-day period. Each involved an attack on an older male member of the defendant's family whom the defendant believed had molested him as a child.[5] The attacks took place in the victims' bedrooms, by an assailant with a gun, and there was no evidence of forced entry. The positions of Wilson's and James's bodies suggested that, like MacArthur, they had been forced to kneel on the bed. Rather than distinct levels of brutality, the incidents could be seen as displaying the assailant's escalating rage: from threats, to an execution-style shooting (which the defendant described to his cousin as something that "had to be done"), to the brutal beating and shooting of James.

Nor has the defendant satisfied his burden of proving that the joinder resulted in compelling prejudice. See *Commonwealth* v. *Gaynor*, 443 Mass. 245, 260 (2005) (defendant bears burden of demonstrating that offenses were unrelated "and that prejudice from joinder was so compelling that it prevented him from obtaining a fair trial"). The judge gave repeated, strong instructions that the Commonwealth had the burden of proving each separate indictment beyond a reasonable doubt.[6] See *id.* at 263. Even had the cases been severed, evidence of motive and pattern of conduct relating to each set of indictments would have been admissible at separate trials in order to demonstrate the defendant's state of mind, a common scheme or plan, or a method of action. See *Commonwealth* v. *Mamay*, *supra* at 417-418; *Commonwealth* v. *Sylvester*, *supra* at 755.

The defendant's motivation was a common, connecting thread: all three men were the subject of the defendant's inquiries of at least two other relatives during the same time period, concern-

---

[5]There was also evidence that the defendant believed that another uncle had molested him, and that, after another male family member denied having abused the defendant, the defendant said that the man was "off the list."

[6]The judge instructed, for example:

"Members of the jury, as you may recall when we selected you to be jurors in this case, I told you that the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant committed both of these crimes. And I'll give you further instructions in this regard. But it's just important that you remember that the burden of proof is always on the Commonwealth, and that burden of proof is beyond a reasonable doubt as to each separate indictment."

ing what the prosecutor called his "family secrets." Testimony by family members indicated that those "family secrets" included childhood sexual abuse and old incidents of violence, and specifically included the defendant's belief that he had been sexually abused by Wilson, James, and MacArthur.

Evidence of prior bad acts also could have been admissible at separate trials to prove identity, based on "a special mark or distinctiveness in the way the acts were committed." *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 505 (1990). The judge did not abuse his discretion in determining that the similarities between the attack on MacArthur and the shootings were sufficiently distinctive. Thus, there was no abuse of discretion in the denial of the defendant's motion to sever.

Even had the joinder been improper, the defendant was not prejudiced by the denial of his motion to sever. That the jury found the defendant guilty of murder in the first degree of Wilson, and assault and battery by means of a dangerous weapon on MacArthur, but were unable to reach a verdict on the indictment charging murder of James, indicates that the jurors carefully weighed the evidence on each separate charge, as the judge instructed. See *Commonwealth* v. *Green*, 52 Mass. App. Ct. 98, 103 (2001) ("discernment by the factfinder in assessing the evidence is a strong indication that a misjoinder of offenses has not resulted in any actual prejudice to the defendant"). See also *United States* v. *Edgar*, 82 F.3d 499, 504 (1st Cir.), cert. denied, 519 U.S. 870 (1996), and cases cited.

2. *Juror voir dire.* Over the defendant's objection, the judge posed some variant of the following question to each potential juror:

> "It's expected that the Commonwealth will not introduce DNA or fingerprint evidence to link the defendant to the crime scene. The Commonwealth will allege that it possesses other evidence to demonstrate that the defendant committed the crimes. Would the absence of DNA or fingerprint evidence prevent you from fairly evaluating the evidence in this case?"

The defendant claims that the question, its variants, and additional explanations provided to certain members of the venire

denied him the right to a fair trial by an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights. He argues that the questions invaded the province of the jury and lessened the Commonwealth's burden of proof, because they precluded the jury from considering any doubt that may have arisen due to the absence of scientific identification evidence in the Commonwealth's case.

We again consider whether a trial judge has abused his discretion by asking members of the venire if they believe that they will be able fairly to evaluate the Commonwealth's evidence notwithstanding the absence of scientific evidence such as DNA or fingerprints. See *Commonwealth* v. *Perez*, 460 Mass. 683, 688 (2011) *(Perez)*. Cf. *Commonwealth* v. *Vuthy Seng*, 456 Mass. 490, 503-504 (2010). "Article 12 of the Declaration of Rights of the Massachusetts Constitution and the Sixth Amendment to the United States Constitution, applied to the States through the due process clause of the Fourteenth Amendment, guarantee the right of a criminal defendant to a trial by an impartial jury. . . . 'The presence of even one juror who is not impartial violates a defendant's right to trial by an impartial jury.' " *Commonwealth* v. *McCowen*, 458 Mass. 461, 494 (2010), quoting *Commonwealth* v. *Vann Long*, 419 Mass. 798, 802 (1995). During jury selection, a trial judge must "examine jurors fully regarding possible bias or prejudice where 'it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them.' " *Perez, supra*, quoting *Commonwealth* v. *Garuti*, 454 Mass. 48, 52 (2009). "The scope of a voir dire is in the sound discretion of the trial judge and will be upheld absent a clear showing of abuse of discretion." *Perez, supra* at 689, quoting *Commonwealth* v. *Garuti, supra*, and cases cited.

The question posed to potential jurors in this case suggests that the judge was concerned with the so-called "CSI effect," a largely speculative "theory that jurors who watch forensic science television programs like 'CSI' will hold prosecutors to an unreasonably high standard of proof because of the prowess displayed by fictional forensic scientists." *Commonwealth* v. *Vuthy Seng, supra* at 503. In addressing the propriety of a CSI question, we have recognized "an inherent tension between our

holding in *Commonwealth* v. *Bowden,* [379 Mass. 472, 485-486 (1980) (*Bowden*)], and questioning the members of the venire about their beliefs regarding scientific evidence, that may in certain circumstances raise the possibility of prejudice to a defendant." *Perez, supra* at 691 n.13.[7] See *Commonwealth* v. *Vuthy Seng, supra* at 504. Thus, "[a]lthough in a particular case a judge may exercise her discretion to ask potential jurors about their views regarding scientific evidence," we have suggested that judges exercise that discretion with caution. *Perez, supra.*

In *Perez, supra* at 689, we concluded that a judge did not abuse his discretion by asking potential jurors "whether they believed 'the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony.' " As posed, that question did not prohibit jurors from considering the lack of scientific evidence as part of their final deliberations, "did not commit the jury to a verdict in advance and . . . did not have the effect of identifying and selecting jurors who were predisposed to convicting the defendant based on evidence the Commonwealth would present." *Id.* at 691.

Although we remain skeptical that there is a need for voir dire questions designed to counter any "CSI effect," and again observe that such questions should be posed sparingly, we conclude that the judge in this case did not abuse his discretion by asking potential jurors whether the absence of scientific evidence would prevent them from fairly evaluating the evidence introduced at trial. See *Commonwealth* v. *Young,* 73 Mass. App. Ct. 479, 485 (2009) (voir dire question properly sought "assurance that the jurors would not automatically vote to acquit due to lack of scientific evidence").

---

[7] In *Commonwealth* v. *Bowden,* 379 Mass. 472, 486 (1980), we determined that the lack of certain evidence, the failure of police to conduct certain tests, or their failure to follow certain procedures "could raise a reasonable doubt as to the defendant's guilt in the minds of the jurors." We thus concluded that a jury may not be instructed to ignore a lack of evidence when deciding whether they have a reasonable doubt about the defendant's guilt. See *id.* at 485-486. "A defendant is entitled to present evidence suggesting that police failed to conduct an adequate investigation. . . . A '*Bowden* defense,' as it has commonly come to be known, may focus on either the failure of police to conduct certain scientific tests or their failure to investigate leads concerning suspects other than the defendant." *Commonwealth* v. *Fitzpatrick,* 463 Mass. 581, 597 (2012).

The question posed suggested to potential jurors that they should evaluate fairly the evidence introduced at trial and was "tailored to ensure that seated jurors were capable of deciding the case without bias and based on the evidence." *Perez, supra* at 691.[8] Although the particular phrasing of certain variations of the question confused several jurors, the substance of the question stands in marked contrast to the erroneous jury instructions at issue in *Bowden, supra* at 486 n.7, in which the judge informed jurors that the absence of scientific evidence "obviously has no bearing on your judgment in connection with this case." The question posed in this case did not commit the jury to a verdict in advance and did not have the effect of creating a jury comprised only of individuals predisposed to convicting the defendant based solely on the Commonwealth's evidence, without consideration of the scientific evidence the Commonwealth failed to introduce.[9] See *Perez, supra.*[10]

Although the judge's further explanations to two jurors during individual voir dire raise some concern, we conclude that there was no abuse of discretion. By asking the first juror to "[p]ut aside the DNA and the fingerprint evidence," and instructing the second juror to "focus solely" on the Commonwealth's evidence, the judge came close to the instruction that we held to

---

[8]The judge properly removed one potential juror based on her statement that, without scientific evidence, she would acquit automatically.

[9]Indeed, one juror who was seated stated that the absence of deoxyribonucleic acid (DNA) or fingerprint evidence could "[p]otentially" affect his view of the rest of the evidence, but agreed that he would be able to focus on the evidence presented and hold the Commonwealth to its burden of proof.

[10]While we conclude that the voir dire question was not improper, it did come closer than the question addressed in *Commonwealth* v. *Perez*, 460 Mass. 683, 689 (2011), to implying that a juror should not consider the absence of scientific evidence in deciding whether the Commonwealth proved the defendant's guilt beyond a reasonable doubt. In *Commonwealth* v. *Perez, supra*, the judge asked jurors whether they believed "the Commonwealth is never able to prove a case beyond a reasonable doubt unless it presents scientific evidence to corroborate witness testimony." The question suggested only that such an extreme position would be incorrect, while reminding jurors that the burden of proof is on the Commonwealth. Here, the judge asked, "[W]ould the absence of DNA or fingerprint evidence prevent you from fairly evaluating the evidence in this case?" We reiterate the need to exercise great care not only in deciding whether to pose a so-called CSI question to potential jurors, but also in phrasing the question to be posed, once the decision to include such a question has been made.

be erroneous in *Bowden, supra.* However, in the context of all of the questions the jurors were asked, neither juror could have concluded, either from the voir dire or from the judge's instructions on the subject, that the juror was to ignore the lack of evidence during deliberations. Rather, the judge's comments clarified for the two potential jurors that the focus of the inquiry was to determine whether they could evaluate the Commonwealth's evidence fairly and impartially and return a verdict based on the evidence; the comments did not amount to a command to ignore the lack of scientific evidence.

3. *Prosecutor's closing argument.* The defendant also contends that the prosecutor improperly used the judge's voir dire questions to argue in closing that the jury should ignore the absence of scientific evidence. At the beginning of his closing argument, the prosecutor responded to the lack of fingerprint and DNA evidence linking the defendant to the crimes by referencing the judge's voir dire question: "You were asked if you could focus on the other evidence that the Commonwealth would present. And that's what I'm asking you to do."

The prosecutor should not have referenced the judge's voir dire question in that manner. By incorporating the judge's question into his closing argument, the prosecutor came close to implying improperly that the judge had instructed the jurors to ignore the lack of scientific evidence linking the defendant to the crimes charged, an instruction that would have violated the rule set forth in *Bowden, supra.* However, considered in the context of the entire closing, and the manner in which the case was prosecuted, this statement did not amount to argument that the jury should ignore the absence of scientific evidence.

The next statement in the prosecutor's closing summarized expert testimony, provided by criminalists from the Boston police department crime laboratory, that explained the absence of DNA and fingerprint evidence. A criminalist from the Boston police department crime laboratory testified that most of the latent fingerprints recovered from Wilson's and James's apartments had "insufficient ridge detail" and therefore could not be reliably matched to an individual. Another criminalist testified that no items recovered from either apartment had been tested for the presence of DNA, because DNA testing would have estab-

lished only the defendant's presence in his relatives' apartments at some point in time. Given the defendant's relationship with both victims, the defendant's presence in their apartments at some point was to be expected, and thus evidence of such presence would have contributed little to the investigation.

Considered as a whole, therefore, the prosecutor's argument was a response to the defendant's claim that the lack of such testing indicated that the police investigation had been inadequate. Cf. *Commonwealth* v. *Hardy,* 431 Mass. 387, 397 (2000) (improper remarks in closing not prejudicial when considered "in the context of the argument and the case as a whole").

4. *Motion to suppress ammunition.* Prior to trial, the defendant moved to suppress a box of nine millimeter ammunition that had been seized from the apartment where the defendant and his sister lived with their mother, following a warrantless search that took place after the defendant's arrest. The motion was denied.

The defendant challenges the denial of his motion to suppress the ammunition, claiming that the search was in violation of the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. "In reviewing a ruling on a motion to suppress, '[w]e accept the judge's subsidiary findings absent clear error but conduct an independent review of his ultimate findings and conclusions of law.' " *Commonwealth* v. *Hoyt,* 461 Mass. 143, 148 (2011), quoting *Commonwealth* v. *Bostock,* 450 Mass. 616, 619 (2008). We conclude that police properly entered the apartment with the defendant's sister's consent, but could not lawfully have remained therein to secure it pending the issuance of a search warrant absent an indication that there were other people inside. Nonetheless, the judge properly denied the motion to suppress, because a search warrant would have been issued regardless of the officers' observations while securing the apartment, and discovery of the ammunition was thus inevitable.

a. *Initial entry.* "Warrantless entries into the home are prohibited by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights absent either probable cause and exigent circumstances, or consent." *Commonwealth* v. *Rogers,* 444 Mass. 234, 236-237 (2005), and cases cited. "When the Commonwealth relies on

consent to justify the lawfulness of a search, it must prove that consent was given freely and voluntarily." *Commonwealth* v. *Gaynor*, 443 Mass. 245, 253 (2005), citing *Bumper* v. *North Carolina*, 391 U.S. 543, 548 549 (1968). Free and voluntary consent means more than mere "acquiescence to a claim of lawful authority." *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Walker*, 370 Mass. 548, 555, cert. denied, 429 U.S. 943 (1976). See *Commonwealth* v. *Tyree*, 455 Mass. 676, 695 (2010). "Voluntariness of consent 'is a question of fact to be determined from the totality of all the circumstances.' " *Commonwealth* v. *Gaynor*, *supra* at 253, quoting *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 227 (1973). "Because a finding of voluntariness is a question of fact, it should not be reversed absent clear error by the judge." *Commonwealth* v. *Carr*, 458 Mass. 295, 303 (2010).

Here, the motion judge, who was not the trial judge, found that the defendant's sister, Alecia Gray, consented to the entry into the apartment. When police knocked on the door and identified themselves, Alecia answered the door and let them in. She told the police that she lived in the apartment along with her five year old son, her mother, and the defendant. Based on these facts, the judge concluded properly that Alecia "gave her voluntary consent" to entry by the officers.[11] The police need not conduct an affirmative inquiry "when the consenting party reasonably appears to have authority to consent." *Commonwealth* v. *Lopez*, 458 Mass. 383, 401-402 (2010) (Cowin, J., dissenting), citing *Georgia* v. *Randolph*, 547 U.S. 103, 122 (2006). See *Illinois* v. *Rodriguez*, 497 U.S. 177, 188-189 (1990). Thus, the initial warrantless entry into the apartment was permissible.

b. *Searching the kitchen and securing the premises.* Although the police lawfully entered the apartment based on Alecia's consent, her consent did not thereby give police further permis-

---

[11]"The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Commonwealth* v. *Porter P.*, 456 Mass. 254, 262 (2010), quoting *Georgia* v. *Randolph*, 547 U.S. 103, 110 (2006).

sion to conduct a search of the premises. See 4 W.R. LaFave, Search and Seizure § 8.1(c), at 22-23 (5th ed. 2012) ("When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent"). Compare *Commonwealth v. Hinds*, 437 Mass. 54, 59 (2002), cert. denied, 537 U.S. 1205 (2003) (no evidence that consent to search for electronic mail was limited to specific directories); *Commonwealth v. Sanna*, 424 Mass. 92, 98 99 (1997) (consent imposed no limitation on scope of entry into home). Such consent may be implicit, but "the Commonwealth must establish that the occupant's words or conduct amounted to something other than mere acquiescence to a claim of authority or simple resignation to the perceived power of uniformed officials." *Commonwealth v. Rogers, supra* at 237-238.

The motion judge found that, after Alecia permitted the police to enter the apartment, and told them that the defendant lived there, "[Detective John] Callahan [of the Boston police department] told Alecia Gray that the Boston Police were going to secure the apartment to prevent the destruction of evidence while they obtained a search warrant."[12] This finding suggests nothing more than that Alecia "acquiesc[ed] to a claim of lawful authority," which is insufficient to establish her voluntary consent to secure and search the apartment. See *Commonwealth v. Tyree, supra* at 695, quoting *Commonwealth v. Sanna, supra* at 97.

Absent consent, whether police may search and secure a residence is governed by *Commonwealth v. DeJesus*, 439 Mass. 616, 621 (2003), in which we addressed "whether the authority to secure a dwelling allows police officers to enter a dwelling and conduct a limited search in order to ascertain whether the dwelling is unoccupied." Although police have authority to secure a dwelling from the outside, "there is a fundamental difference between securing or controlling the perimeter of a dwell-

---

[12] This finding is consistent with Boston police Detective John Callahan's affidavit in support of the warrant to search the apartment, in which he stated that he had "informed Alecia that due to the facts and circumstances surrounding her brother Terry's arrest, her shared residence was going to be secured by Boston police personnel pending the issuance of a search warrant."

ing from the outside and the entry and physical surveillance of a dwelling from the inside." *Id.* Because "any evidence located within an unoccupied dwelling can be fully protected by controlling access to that dwelling from the outside[,] [t]here can be no justification for a warrantless entry absent at least an objectively reasonable belief that someone is inside."[13] *Id.* at 624.

Here, the Commonwealth failed to satisfy its burden to establish that the officers harbored an objectively reasonable belief that anyone other than Alecia and her son, who left the apartment at the officers' request, was in the apartment. The defendant had been arrested and taken into custody before police arrived. Alecia did not indicate to police that someone else was inside the apartment, nor did the judge make any findings that police heard sounds coming from within, or that there was any other basis to suspect that there might be other occupants inside. After the departure of Alecia and her son, securing the residence from the outside would have accomplished the goal of preventing the destruction or removal of evidence from the apartment. The more intrusive search of the apartment was unnecessary, and thus a violation of art. 14 of the Massachusetts Declaration of Rights. Because police were not lawfully present in the kitchen where they saw the box of ammunition, they should not have included in the application for the search warrant their plain view observation of the ammunition. See *Commonwealth* v. *Forde*, 367 Mass. 798, 807 (1975).

c. *Inevitable discovery.* "Although the exclusionary rule prohibits the admission of evidence obtained during an illegal search as 'fruit of the poisonous tree,' evidence initially dis-

---

[13]The court in *Commonwealth* v. *DeJesus*, 439 Mass. 616, 620 (2003), focused primarily on the unlawful entry, but addressed both "the entry and protective sweep." The distinction between the entry and subsequent sweep derives from the recognition that the continued occupation and search of a dwelling may be unlawful even if the initial entry has been made lawfully. As Justice Stevens noted in his dissent in *Segura* v. *United States*, 468 U.S. 796, 820-821 (1984), "the invasion of privacy occasioned by a physical entry does not cease after the initial entry. In *Mincey* v. *Arizona*, 437 U.S. 385 (1978), we held that although the police lawfully entered Mincey's home to arrest him, the Constitution forbade them to remain in the home and to search it." Thus, even if the initial entry were lawful based on an occupant's consent, continued occupation and search of a dwelling beyond the scope of that consent could violate art. 14 of the Massachusetts Declaration of Rights.

covered as a consequence of an unlawful search may be admissible if later acquired independently by lawful means untainted by the initial illegality." *Commonwealth* v. *DeJesus, supra* at 624. Thus, the nine millimeter ammunition seized from the apartment was admissible "as long as the affidavit in support of the application for a search warrant contains information sufficient to establish probable cause to search the defendant's apartment, apart from the observation of the [ammunition]." *Id.* at 625.

Absent the officers' improper observation of the ammunition, the affidavit in support of the search warrant contains the following. Police recovered nine millimeter bullets and shell casings from the scenes where Wilson and James were killed. The defendant told his uncle Earlie that he had "offed Charlie." According to the sign-in sheet at James's apartment building, someone using the defendant's name had been the last person to see James before he died. According to the sign-in sheet at Wilson's apartment building, someone using the name "Troy Brown" visited Wilson on the morning of his death.[14] The defendant told his mother that he believed Wilson, James, and Mac-Arthur had sexually abused him. Early on June 16, 2005, the defendant threatened MacArthur by holding a brown .32 caliber handgun to MacArthur's head. The defendant did not have a firearm in his possession when he was arrested; according to Callahan's training and experience, a firearm is a durable item that is usually stored in its owner's residence or vehicle, if not carried on his person. Numerous sources confirmed that the defendant lived in the apartment where the box of ammunition was found.

To establish probable cause, "[a]n affidavit must contain enough information for an issuing magistrate to determine that the items sought are related to the criminal activity under investigation, and that they reasonably may be expected to be located in the place to be searched at the time the search warrant issues." *Commonwealth* v. *Matias,* 440 Mass. 787, 792 (2004), quoting *Commonwealth* v. *Cruz,* 430 Mass. 838, 840 (2000). An affidavit establishes probable cause to search a defendant's residence "when there is evidence that it was 'reasonably

---

[14]"Brown" is the surname of the defendant's biological father.

likely' that the items specified in the affidavit could be found there." *Commonwealth* v. *McDermott*, 448 Mass. 750, 768, cert. denied, 552 U.S. 910 (2007), citing *Commonwealth* v. *Wilson*, 427 Mass. 336, 343 (1998); *Commonwealth* v. *James*, 424 Mass. 770, 778 (1997). Items sought are "reasonably likely" to be found in a defendant's home when the items are "durable [and] of continuing utility to the defendant . . . ." *Commonwealth* v. *Wilson, supra*, quoting *Commonwealth* v. *James, supra*.

Here, the affidavit linked nine millimeter ammunition to both shootings, linked the defendant to those shootings, and established the defendant's address. From these statements in the affidavit, the magistrate properly could have drawn that reasonable inference. See *Commonwealth* v. *Wilson, supra*, citing *Commonwealth* v. *James, supra*.

Because a valid search warrant would have issued regardless of the inclusion of the tainted information discovered during the initial entry into the apartment, there was an independent source for the challenged evidence. See *Commonwealth* v. *DeJesus, supra* at 627. On this basis, we affirm the denial of the defendant's motion to suppress the ammunition.

5. *Review under G. L. c. 278, § 33E.* After careful review of the entire record, we conclude that there is no basis to reduce the murder conviction to a lesser degree of guilt or to order a new trial.

*Judgments affirmed.*