NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11574

COMMONWEALTH vs. ARIEL HERNANDEZ.


Middlesex.      October 9, 2015. - December 29, 2015.

Present: Gants, C.J., Spina, Botsford, Lenk, & Hines, JJ.


Homicide. Robbery. Armed Home Invasion. Home Invasion.
    Firearms. Felony-Murder Rule. Evidence, Firearm.
    Constitutional Law, Search and seizure, Probable cause.
    Probable Cause. Search and Seizure, Motor vehicle,
    Probable cause, Inevitable discovery. Practice, Criminal,
    Capital case, Motion to suppress, Severance, Trial of
    indictments together.



Indictments found and returned in the Superior Court
Department on December 10 and 22, 2009.

A pretrial motion to suppress evidence was heard by Thomas
P. Billings, J., and the cases were tried before him.


Dana Alan Curhan for the defendant.
Casey E. Silvia, Assistant District Attorney, for the
Commonwealth.


HINES, J. Based on an armed robbery that occurred during

the evening of October 22, 2009, and an armed home invasion and

double murder that occurred several hours later, a jury

convicted on indictments charging the defendant with two counts of armed robbery; two counts of murder in the first degree on the theory of felony-murder (with armed home invasion and attempted armed robbery as the underlying felonies); and one count each of home invasion, unlawful possession of ammunition, and possessing a firearm without a license.  The defendant's trial was joined with the trials of two codefendants, cousins Karon and Jamal McDougal,[1] on each of their indictments charging two counts of felony murder and one count of home invasion, and with Jamal's indictments for firearms offenses.  Karon and Jamal were acquitted of all charges.  On appeal, the defendant argues (1) error in the denial of his motion to suppress the firearm used in the armed robbery and murders and (2) error in the joinder of trial with his codefendants and in the joinder of the armed robbery charges and charges relating to the home invasion. We affirm the order denying the defendant's motion to suppress as well as the defendant's convictions, and we discern no basis to exercise our authority pursuant to G. L. c. 278, § 33E.

1.  Motion to suppress.  a.  Background.  Prior to trial, the defendant filed a motion to suppress the firearm evidence, claiming, on State and Federal constitutional grounds, that police lacked probable cause for the warrantless search and the

_____

[1] Where the codefendants share a common surname, we refer to each by their first name.

search exceeded the bounds of a proper inventory search. The motion judge, who was also the trial judge, held an evidentiary hearing, at which one witness, Officer Christian Hanson of the Lowell police department, testified. The judge denied the motion and made the following findings of fact, "which we supplement with evidence in the record that is uncontroverted and that was implicitly credited by the motion judge," see Commonwealth v. Melo, 472 Mass. 278, 286 (2015). On October 23, 2009, Officer Hanson reported for his shift at approximately 1 A.M. and learned of a reported armed robbery of two females that had occurred at approximately 8:30 P.M. on October 22, 2009. The robbery had taken place on Second Avenue in Lowell and a handgun was used. The two female victims who reported the robbery described the vehicle as a green Honda Civic sedan, bearing a specified license plate number, and with a Dominican Republic flag hanging from the rear view mirror. The perpetrators were described generally as Hispanic males.

Officer Hanson was assigned to Lowell's eastern sector and was driving alone and uniformed in a marked cruiser. At 1:33 A.M., Hanson learned through a police dispatch that an armed home invasion had occurred at a home on Marshall Terrace, that a handgun had been used, and that two occupants had been shot. Hanson knew that the location of the invasion was approximately fifty yards from the earlier armed robbery. At approximately

2:20 A.M., a dispatch alerted him that the same vehicle was involved in the earlier armed robbery and the home invasion and noted the address of the vehicle's registered owner as Phillips Street.[2]

Officer Hanson drove towards Phillips Street, looking for the vehicle. Within minutes of the second dispatch, while heading in a westerly direction on Broadway Street, he came up behind a vehicle matching the exact description, including the license plate number and the Dominican flag. Hanson followed the vehicle as it turned left twice so that it was heading parallel to Broadway in the opposite direction, away from Phillips Street. He called for backup. Hanson saw the vehicle fail to stop at a stop sign. Officer Hanson stopped the vehicle at an intersection as two other cruisers arrived. The driver of the vehicle pulled over at Officer Hanson's command. Hanson and two other officers got out of their cruisers and approached the vehicle with weapons drawn.

---

[2] There was no evidence as to how the police obtained the description of the vehicle used in the home invasion and, as such, the motion judge properly did not include the description or registered owner's address in his probable cause calculus. See Commonwealth v. Cheek, 413 Mass. 492, 494-495 (1992) ("Where the police rely on a police radio call to conduct an investigatory stop, under both Federal and State law, the Commonwealth must present evidence at the hearing on the motion to suppress on the factual basis for the police radio call in order to establish its indicia of reliability").

Officer Hanson and one of the officers approached the driver's side and Hanson ordered the occupants to raise their hands and keep them in plain sight. The defendant, who was the driver, was loud and belligerent and shouted, "What the fuck did I do?" The defendant was "moving around" in the driver's seat and then reached for the center console. At that point, the two officers pulled the defendant to the ground outside the vehicle and handcuffed him. The third officer did the same to Giovanni Hill who was in the passenger's seat. The officers searched the vehicle, and after finding no weapons or contraband in the passenger's compartment, they opened the trunk and found a handgun. Officer Hanson testified that they had searched the trunk because they were looking for the firearm involved in the earlier armed robbery.

Shortly thereafter, one of the robbery victims was brought to the scene for a showup identification. She identified Hill as one of the robbers. Specifically, Officer Hanson testified that the victim said that Hill was standing "next to the man that was holding the gun with the hood or a mask over his face" during the robbery. The police arrested the defendant on firearms charges and Hill for armed robbery.

The judge concluded that the search was justified under the automobile exception to the warrant requirement because, quoting Carroll v. United States, 267 U.S. 132, 162 (1925), there was

enough evidence to "'warrant a man of reasonable caution in the belief' . . . that the handgun would be in the vehicle, perhaps in the trunk and out of sight." The judge reasoned that the six hours that had passed between the robbery and the automobile stop were not fatal where "it was reasonable to think that one or both of the occupants at the time of the stop had probably been using the vehicle at the time of the robbery," the occupants of the vehicle "fit the very general description of the robbers," and a handgun had been used in both the robbery and the later home invasion. Moreover, the judge concluded that the police had "ample probable cause" to search the entire vehicle, including the trunk, after the showup identification, at which Hill was identified as one of the robbers.

The defendant maintains on appeal that the firearm should have been suppressed because the police lacked probable cause to search the trunk and because the warrantless search was not justified under the inevitable discovery doctrine.[3]

b. Discussion. "In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of his ultimate findings and conclusions of law.'" Commonwealth v.

---

[3] The defendant also argues that the search was not justified on safety grounds or as a search incident to arrest, but the Commonwealth does not argue on appeal that either theory justifies the search, and the motion judge agreed with the defendant on these grounds.

Craan, 469 Mass. 24, 26 (2014), quoting Commonwealth v. Scott, 440 Mass. 642, 646 (2004). "The judge determines the weight and credibility of the testimony." Commonwealth v. Woods, 466 Mass. 707, 717, cert. denied, 134 S. Ct. 2855 (2014), citing Commonwealth v. Sinforoso, 434 Mass. 320, 321 (2001). We, however, "make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." Woods, supra, quoting Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).

"Warrantless searches are presumptively unreasonable, under both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, subject only to 'a few specifically established and well-delineated exceptions.'" Commonwealth v. Gouse, 461 Mass. 787, 792 (2012), quoting Commonwealth v. Bostock, 450 Mass. 616, 624 (2008). "Under the automobile exception to the warrant requirement, the search of a motor vehicle is reasonable and permissible where probable cause exists to support the search." Commonwealth v. Johnson, 461 Mass. 44, 49 (2011). If the police lacked probable cause under the automobile exception or otherwise performed an illegal search, the inevitable discovery doctrine permits the admission of evidence that ordinarily would be prohibited by the exclusionary rule. See Commonwealth v. Gray, 465 Mass. 330, 345-346, cert. denied, 134 S. Ct. 628 (2013). The issue, then,

is whether the police had probable cause to search the trunk before the showup identification; and if not, whether the Commonwealth met its burden to prove that the firearm is admissible under the inevitable discovery doctrine.

i. Automobile exception. A warrantless search of an automobile is permissible "where the police have probable cause to believe that a motor vehicle parked in a public place and apparently capable of being moved contains contraband or evidence of a crime." Gouse, 461 Mass. at 792, quoting Bostock, 450 Mass. at 624. "The existence of probable cause depends on whether the facts and circumstances within the officer's knowledge at the time of making the search or seizure were sufficient to warrant a prudent man in believing that the defendant had committed, or was committing, an offense." Bostock, 450 Mass. at 624, quoting Commonwealth v. Miller, 366 Mass. 387, 391 (1974). If the police had probable cause to search any part of the vehicle under the automobile exception, the police were entitled to search "all containers, open or closed, found within." Gouse, supra, quoting Commonwealth v. Cast, 407 Mass. 891, 908 (1990).

Officer Hanson, acting on the reliable information before him, had probable cause to search the trunk. Gouse, 461 Mass. at 794, quoting Cast, 407 Mass. at 895 ("In dealing with probable cause, . . . as the very name implies, we deal with

probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act"). The information supporting probable cause included the following:[4] (1) a robbery involving a firearm occurred at 8:30 to 8:45 P.M.; (2) the vehicle involved in the robbery was a green Honda Civic sedan, bearing a specified license plate number, and with a Dominican Republic flag hanging from the rear view mirror; (3) the perpetrators were described as two Hispanic males; (4) an armed home invasion, where two people were shot, occurred approximately five hours after and approximately fifty yards from the armed robbery; (5) a vehicle matching the exact description of the vehicle used in the armed robbery was going in the general vicinity of the two crimes approximately six hours after the robbery; (6) the vehicle changed direction after the police cruiser approached, turning 180 degrees from its original direction; (7) the vehicle failed to stop at a stop

---

[4] The information contained in the second dispatch, the descriptions of the vehicle and "two Hispanic males" and the address of the registered owner of the vehicle, was not considered by the motion judge and, likewise, is not considered in our determination of probable cause. The Commonwealth did not offer the basis of knowledge for the source of the information contained in that dispatch, and therefore, the Commonwealth has not shown that the information is reliable. See Commonwealth v. Lopes, 455 Mass. 147, 155-156 (2009) (Commonwealth must show reliability of police broadcast through "basis of knowledge of the source of the information . . . and the underlying circumstances demonstrating that the source of the information was credible or the information reliable").

sign after the police cruiser approached; (8) the occupants of the vehicle were two Hispanic-appearing males; (9) the driver of the vehicle was belligerent and made furtive gestures; and (10) no weapons or contraband were located inside the interior of the vehicle.  The sum of the information known to police formed a sufficient basis on which to search the entire vehicle, including the trunk, because the officers could have appropriately concluded that the vehicle used in the armed robbery, occurring hours prior in the same general proximity to the location of the stop, contained evidence of that crime.

The defendant's argument against probable cause hinges on the six-hour gap between the armed robbery and the stop, and the lack of a specific description of the perpetrators.  We disagree that either factor is fatal.  Although "[f]acts supporting probable cause must be 'closely related to the time of the issue of the warrant [so] as to justify a finding of probable cause at that time,'" we conclude that the temporal component was satisfied under these circumstances.  See Commonwealth v. Matias, 440 Mass. 787, 792 (2004), quoting Commonwealth v. Cruz, 430 Mass. 838, 843 (2000).

Our conclusion is guided by the nature of the crime and of the evidence.  "A nexus between the items to be seized and the place to be searched need not be based on direct observation and may be found in 'the type of crime, the nature of the missing

items, the extent of the suspect's opportunity for concealment, and normal inferences as to where a criminal would be likely to hide stolen property.'" Commonwealth v. Burt, 393 Mass. 703, 715-716 (1985), quoting Commonwealth v. Cinelli, 389 Mass. 197, 213, cert. denied, 464 U.S. 860 (1983). Here, Officer Hanson knew that a firearm was used in an armed robbery by occupants of a vehicle that was stopped six hours after the crime occurred. Although it is possible that the perpetrators of the robbery could have hidden the firearm elsewhere in the time that passed, it is a reasonable inference that the firearm, evidence not easily disposed of, was hidden in the trunk. See Burt, supra at 716 ("because the hasty disposal of large amounts of coins could have been risky to the alleged thieves, the inference that some of the coins would be found in the defendants' residences and vehicles was reasonable").

Further, it was not unreasonable to suspect that the current occupants of the vehicle were using the vehicle six hours earlier where there was no information that the vehicle was a rental and the occupants matched the very general description of the perpetrators. Cf. Commonwealth v. Jordan, 469 Mass. 134, 146 (2014) (police lacked probable cause where vehicle with license plate number matching that involved in shooting two days earlier known to be rented and officers did not know identity of renter or terms of rental arrangement). In

addition to providing a precise description of the vehicle, the victims described the perpetrators as two males of Hispanic descent, which narrowed the range of possible suspects and corresponded with the description of the males in the vehicle during the stop. See Commonwealth v. Mercado, 422 Mass. 367, 371 (1996) (general description of two Hispanic males narrowed "range of possible suspects" for reasonable suspicion).

In addition to the evidence discussed above, the driver's evasive movements after the marked cruiser approached -- failing to stop at a stop sign and turning 180 degrees from his initial direction -- may be considered. See Commonwealth v. Ortiz, 376 Mass. 349, 354 (1978) (evasive movements insufficient, but relevant, for determining probable cause). Further supporting our analysis is the defendant's belligerent behavior between the stop and the search that heightened the officers' suspicions when he reached towards the center console when instructed to keep his hands up. See Commonwealth v. Va Meng Joe, 425 Mass. 99, 106 (1997), citing Commonwealth v. Alvarado, 420 Mass. 542, 551 (1995) (exiting vehicle at red light when approached by police and "furtively reach[ing] into his pocket" are "additional factor[s] that allows us to conclude that, at the time of the search, the police officers had probable cause to believe that the defendant had committed, or was committing, a crime").

ii.  Inevitable discovery.  Even if the officers acted prematurely in opening the trunk, the firearm would still be admissible so long as the Commonwealth proved by a preponderance of the evidence that the firearm would have been inevitably discovered.  Commonwealth v. Balicki, 436 Mass. 1, 16 (2002).  Under the inevitable discovery doctrine, evidence may be admissible as long as the Commonwealth can demonstrate that discovery of the evidence by lawful means was certain as a practical matter, "the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression."  Commonwealth v. Sbordone, 424 Mass. 802, 810 (1997), citing Commonwealth v. O'Connor, 406 Mass. 112, 117-118 (1989).  This is a "demanding test."  Balicki, supra, quoting Commonwealth v. Perrot, 407 Mass. 539, 548 (1990).

After the showup identification, the police had robust evidence supporting probable cause.  At that point, they had direct evidence that an occupant of the vehicle was involved in the armed robbery that occurred six hours before the stop.  Thus, the Commonwealth met its burden in this regard.

The defendant argues that the inevitable discovery doctrine is not applicable where Hill had no connection to the vehicle other than as a passenger, it was not certain that the police would search the trunk after the identification, and the police

acted in bad faith.  The defendant's arguments are unavailing.
Hill's presence supports the inference that the firearm was
hidden in the vehicle.  It was "certain as a practical matter"
after Hill was identified that the police would search the trunk
because evidence from the armed robbery was not in the passenger
compartment and the officers were still looking for the firearm.
Sbordone, 424 Mass. at 810.  Lastly, the officers did not act in
bad faith where the defendant was not harmed by the potentially
premature search of the trunk.  The bad faith component of the
inevitable discovery rule is designed to ensure that "the
Commonwealth's case is not aided (or the defendant's case
harmed) by the unlawful, premature discovery of the evidence."
O'Connor, 406 Mass. at 119.  The firearm was properly admitted
where it would have been discovered during the course of the
stop and there is no allegation that the firearm played any role
in the victim's identification of Hill.[5]

The evidence supports the denial of the defendant's motion
to suppress.

---

[5] The defendant does not dispute that the stop and showup
identification were both lawful.  The identification properly
occurred during the stop.  See Commonwealth v. Salerno, 356
Mass. 642, 646-647 (1970), quoting Ker v. California, 374 U.S.
23, 34 (1963) ("An expeditious collateral inquiry which might
result in the suspects' arrest or prompt release is not
unreasonable when done to meet 'the practical demands of
effective criminal investigation and law enforcement'").

2.  <u>Trial</u>.  a.  <u>Background</u>.  As key witnesses at trial, Commonwealth presented testimony from the two armed robbery victims, Sophia Deno and Ashley Cardoso; from witnesses inside Marshall Terrace during the home invasion and murders, Kyle Delgado and Brian Staples; and from several cooperating witnesses who were with the defendant during the evening of the armed robbery and home invasion:  Hill, Darien Doby, and Joshua Silva.  We recite the facts the jury could have found based on the Commonwealth's case.  <u>Commonwealth</u> v. <u>Latimore</u>, 378 Mass. 671, 676-677 (1979).  Prior to the armed robbery, a vehicle drove slowly by the victims, Deno and Cardoso, two times and then parked around the corner from them.  The vehicle was a green Honda Civic with a Dominican flag hanging from the rear-view mirror and owned by the defendant's sister.  The vehicle contained the defendant, Hill, Doby, and Tim Brown.  The defendant got out of the vehicle with Hill and removed a firearm from the trunk.  The defendant approached Deno and Cardoso and asked them to give him their "stuff."  When they did not immediately agree, the defendant pointed a gun at Cardoso's arm and took both victims' purses.  During the encounter, Hill stood five to ten feet away laughing.

The defendant was wearing a khaki or green colored sweatshirt with a hood covering all of his face except his mouth.  Cardoso's statement to police was read in evidence, in

which she said, "I could tell by his face and the tone of his voice that he was Spanish," and described the defendant as five feet, nine inches to five feet, ten inches tall, with a "little kind of moustache" and maybe "a little bit of chin hair." Hill was wearing a red and tan jacket.

After the robbery, the two reentered the vehicle; the defendant sat in the driver's seat with the two purses and firearm on his lap, and Hill entered the passenger side of the vehicle. The group then drove to Simon Phanthai's house where Phanthai, at the defendant's request, gave the defendant a black sweatshirt to wear instead of his green hooded sweatshirt. Phanthai joined the group, and after a brief separation, Phanthai, the defendant, Hill, Brown, and Doby met at Brown's house.

At Brown's house, the defendant went through the victims' purses and retrieved eighty dollars. He told Hill to take one of the victim's debit cards to a bank's automated teller machine to try to withdraw money. After trying to withdraw money at two banks, Hill returned unsuccessful.

At about 11:45 P.M., the two codefendants at trial, Jamal and Karon, arrived at Brown's house. Either Jamal or Karon asked the defendant if he wanted to be involved in a robbery. The defendant agreed to join them and to bring his gun. Silva drove his 1995 Toyota Camry to Brown's house to meet the group

and agreed to be the driver for the robbery.  The defendant, Jamal, and Karon all changed into different clothes provided by Brown.  The defendant put on a Boston Red Sox sweatshirt with a large "B" on it, Jamal put on a black sweatshirt with a hood, and Karon put on sweatpants.  Jamal obtained a gun from Brown.

The defendant, Jamal, Karon, and Silva left Brown's house. Jamal instructed Silva where to drive.  Silva remained in the vehicle and watched the other three walk towards the residence and through a garage.

The two murder victims, Luis Antonio Martinez Delgado, known as "Tony," and Hector Delgado, lived at Marshall Terrace with Brian Staples and Michael DelGreco.  The Delgados sold marijuana from their four-story house.  All four residents, in addition to the Delgados' nephew, Kyle Delgado, were at the home during the crime.  Kyle and Tony were on the fourth floor, Hector and Staples were in their rooms on the third floor, and DelGreco was on the couch on the second floor.

At or around 1 A.M., there was a loud bang, like a "battering ram" on the door.  Tony yelled to see who was there and someone responded "Nicole."  Tony went downstairs and told Kyle to remain upstairs.  Kyle was hiding during most of the home invasion and did not see any intruders.  Staples came down from the third floor and saw two males, each with a gun.  One male was holding a gun to Tony's head and the second male

started walking toward Staples with his gun drawn when Staples came down the stairs.  Staples testified that the male with Tony was broad, wearing a black or gray jacket with a hood, and "maybe a little bit taller" than Tony, who was five feet, eight inches or five feet, nine inches tall.  The male who approached Staples was a "little shorter" with a "smaller frame" than the male with Tony, was wearing a "reddish" jacket with an emblem and a hood pulled down to his nose, had a "little goatee," and had "dark skin, Spanish."[6]

The male with Tony asked, "Where is it?"  Tony responded, "I don't have anything," and Staples ran upstairs to his bedroom to call 911.  Kyle and Staples both heard gunshots while hiding. When they emerged, they found Hector lying on his back in his bedroom with a visible bullet hole in his stomach.  Tony was lying on his stomach at the top of the stairs leading to the fourth floor with a visible bullet hole in his back.

Silva waited in his vehicle outside Marshall Terrace. Karon returned three to four minutes after he had left the vehicle and Jamal and the defendant returned to the vehicle approximately five minutes after Karon.  Jamal told the defendant that he was a great shot and the defendant responded,

---

[6] In an array containing the defendant's photograph, Staples pointed to the defendant but said he was not able to positively identify anyone.  The defendant's photograph "looked similar in bearded features," but Staples "couldn't be 100 percent positive, since he felt the beard was a little bit longer."

"I know once I seen them jump on you I started shooting." The group returned to Brown's house. A surveillance system from an automotive garage nearby Marshall Terrace showed Silva's Toyota Camry automobile driving down Orford Street, which is parallel to Marshall Terrace.

Back at Brown's house, the defendant and Jamal conversed about the events that had occurred. The jury heard that Karon tried to kick in the door, that somebody answered "Nicole" to a person in Marshall Terrace, that Jamal was going to Boston to hide, and that the defendant and Jamal would act like they did not know each other if the police came.

The defendant, Hill, and Doby left Brown's apartment together in the vehicle belonging to the defendant's sister. Hill placed the defendant's gun in the trunk of the vehicle. The defendant dropped off Doby and was headed to Hill's house when he and Hill were stopped by police and subsequently arrested.

Gunshot residue samples were taken from the defendant and Hill after the arrest; the sample from the defendant tested positive and the sample from Hill tested negative. A ballistics expert from the State police opined that the firearm obtained during the search of the trunk fired the cartridge casing and projectiles recovered from Marshall Terrace and from the bodies of Tony and Hector.

In closing arguments, defense counsel for all three defendants argued that other persons present at Brown's apartment on the evening leading to the armed home invasion and double murder were responsible. The defendant's counsel argued that Silva and Brown were the perpetrators, not the defendant and the McDougal codefendants. Karon's counsel named Brown, Silva, and Hill as culpable parties. Jamal's counsel argued that the four persons involved were Brown, Silva, Doby, and Hill.

b. <u>Joinder</u>. The defendant argues that his right to due process guaranteed by the Fifth Amendment to the United States Constitution and as applied to the States by the Fourteenth Amendment was violated by the joinder of his trial with the McDougals and the joinder of his offenses. The defendant's argument is unavailing.

i. <u>Joinder of defendant and codefendants at trial</u>. Prior to trial, the defendant moved to sever his case from the cases of Jamal and Karon, arguing that he, Jamal, and Karon would present inconsistent defenses for a number of reasons. Defense counsel renewed the motion several times during trial, and each time, the motion was denied.[7] As his primary contention on

---

[7] The defendant argued that the defenses were inconsistent because: (1) Jamal and Karon each moved to enter photographs of individuals, including the defendant, holding firearms; (2) statements made by Jamal after the homicide about details of the

appeal, the defendant argues that he was prejudiced by Jamal and Karon's trial strategy because Jamal and Karon, African-American men, effectively "point[ed] the finger" at the defendant by highlighting testimony that the perpetrators of the home invasion were Hispanic. Jamal and Karon's counsel moved to sever from the defendant on similar grounds, asserting that Jamal and Karon "want these two intruders to be Spanish" and the defendant's attorney "wants the two intruders to be black" or "some other color but certainly not Spanish." The judge denied the motions after reasoning that the defenses did not require the jury to determine that one defendant or another was guilty, noting that "[t]here are lots of black people and lots of Hispanic people to go around."

It is presumed that individuals will be tried together when criminal charges "arise out of the same criminal conduct." Commonwealth v. Siny Van Tran, 460 Mass. 535, 542 (2011), quoting Mass. R. Crim. P. 9 (b), 378 Mass. 859 (1979), and citing Commonwealth v. Smith, 418 Mass. 120, 125 (1994). A judge may sever trials if it appears that joinder "is not in the best interests of justice," Mass. R. Crim. P. 9 (d), and should

---

murder would prejudice the defendant's case; (3) Jamal and Karon's counsel highlighted the description of the home invasion intruder as "sounding Hispanic"; (4) Jamal's counsel introduced a statement allegedly made by the defendant while in jail naming Jamal as the shooter; and (5) Jamal's counsel introduced evidence that gunshot residue was found on the steering wheel of the vehicle the defendant was driving.

sever trials if: (1) the defenses are mutually antagonistic where the "sole defense of each [is] the guilt of the other," Siny Van Tran, supra, quoting Commonwealth v. Stewart, 450 Mass. 25, 31 (2007); or (2) "the prejudice resulting from a joint trial is so compelling that it prevents a defendant from obtaining a fair trial." Siny Van Tran, supra, quoting Commonwealth v. Moran, 387 Mass. 644, 658 (1982). "Nonetheless, 'even mutually antagonistic and irreconcilable defenses do not require severance if there is sufficient other evidence of guilt.'" Commonwealth v. Akara, 465 Mass. 245, 257 (2013), quoting Commonwealth v. Vasquez, 462 Mass. 827, 838 (2012).

There was no abuse of discretion in the denial of the motions to sever because the defenses at trial were not mutually exclusive and joinder did not prevent the defendant from obtaining a fair trial. Although the codefendants differed in the descriptive characteristics they wanted the jury to remember about the intruders, the defendant did not need the jury to believe that Jamal or Karon were guilty in order to obtain an acquittal. See Siny Van Tran, 460 Mass. at 542. Instead of naming each other, the three codefendants all named other third parties as the actual perpetrators.[8] Counsel for each defendant argued that the witnesses who testified for the Commonwealth in

---

[8] The defenses also were consistent in that each asserted inadequate police investigation under Commonwealth v. Bowden, 379 Mass. 472, 485-486 (1980).

exchange for deals were lying to protect themselves and other friends and all asserted that Brown and Silva were involved in the murders instead of their clients.

The defendant also argues on appeal that joinder was prejudicial where Jamal's counsel introduced a statement allegedly made by the defendant while in jail, naming Jamal as the shooter. The judge instructed the jury to disregard any reference to the defendant as the declarant. The jury are presumed to follow instructions. Commonwealth v. Andrade, 468 Mass. 543, 549 (2014), citing Commonwealth v. Gonzalez, 465 Mass. 672, 681 (2013). Moreover, any harm that the defendant may have suffered by the admission of this evidence should be viewed against the benefit he received as a result of the joinder with Karon. Because the defendant's trial was joined with Karon's, the jury did not hear a statement made at Brown's house wherein the defendant asserted that he shot two people inside Marshall Terrace. Although discussion of events before and after the home invasion were admitted against all three defendants, this statement was excluded because the theory of adoptive admission was not satisfied where there was insufficient evidence that Karon actually entered the home. The judge noted that he would likely have admitted the statement had Karon's trial been severed.

Lastly, there was no error where considerable evidence linked the defendant to the crime. See Akara, 465 Mass. at 257. The firearm belonging to the defendant, which was located in the trunk of the vehicle he was driving in the early morning hours following the murder, fired the projectiles recovered from the bodies of the victims. Gunshot residue was found on the defendant's hands shortly after the murders. Even if the defenses at trial were irreconcilable, denial of the motions to sever would not require a new trial where there was "considerable independent evidence" of the defendant's guilt. Akara, supra, quoting Vasquez, supra at 838; id. at 838 n.10 ("For purposes of severance, independent evidence is evidence that is not offered by one defendant against another at their joint trial").

ii. Joinder of charges. The defendant claims that the trial for armed robbery should not have been joined with the indictments stemming from the home invasion and murders. He argues that joinder of the charges was prejudicial and improper where the indictments were unrelated and the potential for prejudice outweighed any governmental interest in a single trial. Specifically, the defendant argues that, other than the firearm, "no evidence relating to either set of charges . . . could have been introduced in a trial of the other set of

charges" and propensity to engage in criminal activity likely contributed to convictions on both charges.

Joinder "shall" be allowed when a defendant is charged with two or more related offenses unless the trial judge "determines that joinder is not in the best interests of justice." Gray, 465 Mass. at 334-335, quoting Mass. R. Crim. P. 9. To succeed on a claim of misjoinder, the defendant "bears the burden of demonstrating that the offenses were unrelated, and that prejudice from joinder was so compelling that it prevented him from obtaining a fair trial." Commonwealth v. Pillai, 445 Mass. 175, 180 (2005), quoting Commonwealth v. Gaynor, 443 Mass. 245, 260 (2005). The trial judge's decision whether to join offenses will not be reversed unless there has been a "clear abuse of discretion." Pillai, supra, quoting Commonwealth v. Walker, 442 Mass. 185, 199 (2004).

"For purposes of joinder, offenses are related 'if they are based on the same criminal conduct or episode or arise out of a course of criminal conduct or series of criminal episodes connected together or constituting parts of a single scheme or plan.'" Pillai, 445 Mass. at 180, quoting Mass. R. Crim. P. 9 (a) (1). Factors that may be considered when determining whether offenses are related include factual similarities, closeness of time and space, and "whether evidence of the other

offenses would be admissible in separate trials on each offense."  Pillai, supra.

The defendant failed to demonstrate that the offenses are unrelated.  The offenses were factually similar in that the defendant used his firearm in an attempt to coerce the victims of each incident to relinquish money and the crimes were close in time and space, occurring within approximately fifty yards of each other and within a time span of five hours.

Moreover, evidence of each offense would be admissible in separate trials.  Although evidence of other bad or criminal acts are not admissible to show "bad character or propensity to commit the crime charged," it may be admissible "for some other probative purpose, including to show intent, motive, state of mind, or some other relevant issue at trial."  Commonwealth v. Dung Van Tran, 463 Mass. 8, 14 (2012), quoting Commonwealth v. Morgan, 460 Mass 277, 289 (2011).

In this case, evidence of the armed robbery, in which the defendant obtained eighty dollars and was unsuccessful in obtaining more money through the use of the victim's debit card, was relevant to show the defendant's intent, motive, and state of mind when participating in the home invasion.  The evidence, therefore, would have been admissible at trial on the home invasion and murders.  Dung Van Tran, supra.

Similarly, evidence of the home invasion would have been admissible at trial on the armed robbery. The "'prosecution [is] entitled to present as full a picture as possible of the events surrounding the incident itself,' as long as the probative value of the evidence presented is not substantially outweighed by any prejudice to the defendant." Commonwealth v. Robidoux, 450 Mass. 144, 158 (2007), quoting Commonwealth v. Marrero, 427 Mass. 65, 67 (1998). The defendant presented a third-party culprit defense to the armed robbery, arguing that there was insufficient evidence to convict him where the only identification of his participation was made by Hill, a cooperating witness. While evidence of the murders may not have been admissible, evidence of the home invasion, which was "inextricably intertwined" with the defendant's earlier attempts to obtain money through the armed robbery, would have been permitted. Marrero, supra at 67-68, quoting Commonwealth v. Bradshaw, 385 Mass. 244, 269 (1982) (prior bad act evidence "inextricably intertwined" with charged offense allowed to rebut inference of "inexplicable act of violence").

The defendant also argues that joinder was improper because the best interests of justice supported severance. The "best interests of justice" are determined by "weighing the defendant's interests against judicial economy." Gray, 465 Mass. at 335, quoting Commonwealth v. Sylvester, 388 Mass. 749,

758 (1983). The defendant's argument is unavailing because considerable evidence of the home invasion and armed robbery would have been admissible in separate trials. Additionally, the judge repeatedly instructed the jury that the Commonwealth had the burden of proving each separate indictment beyond a reasonable doubt.[9] Thus, there was no abuse of discretion in the denial of the defendant's motion to sever. See Gray, supra at 336-337.

3. Relief pursuant to G. L. c. 278, § 33E. We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and we discern no basis on which to grant the defendant relief.

So ordered.

---

[9] In addition to instructing the jury in the preliminary and final instructions that the Commonwealth must prove beyond a reasonable doubt each of the elements of each offense, the judge gave the following preliminary instructions:

"What I do want to discuss at this point is that each defendant is entitled to individual judgment and the Commonwealth is entitled to your individual judgment as to each defendant. And that goes for each defendant and each count. So, although we have a number of counts against each defendant and we have a number of defendants together in the courtroom, it's not a case of one for all and one for all. It may be that you find all the defendants not guilty, or some guilty and some not guilty, or some perhaps guilty on some charges and not the others. So I guess a short way to say that is that everybody concerned is entitled to have you exercise individual judgment as to each defendant and each charge."