NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-107

COMMONWEALTH

vs.

EUGENIO S. LARA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the District Court, the defendant was convicted of distribution of heroin, possession of heroin with intent to distribute, and a related school zone violation, see G. L. c. 94C, §§ 32 (a), 32J.[1]  The charges stemmed from the sale of a small amount of heroin in a high crime area of Lawrence.  During the investigation, the buyer identified the defendant as the seller.  When the police stopped the defendant and searched him, they found more heroin in the defendant's pocket.  On appeal, the defendant argues that his motion to suppress the drugs seized from his person was improperly denied

_____

[1] A nolle prosequi was entered on an additional school zone violation at the beginning of the trial.

and a substantial risk of a miscarriage of justice resulted from the admission of improper opinion testimony at trial.  We affirm.

Motion to suppress.  Two witnesses, Captain Roy Vasque and Lieutenant Mark Ciccarelli of the Lawrence police department, testified at the evidentiary hearing on the motion to suppress. Both Vasque and Ciccarelli were members of the department's street narcotics enforcement unit (SNEU) charged with investigating street-level distribution of narcotics.  The motion judge found both officers credible and adopted "their testimony in [its] entirety."  We summarize the relevant facts from the motion judge's findings, supplemented by uncontroverted and undisputed facts from the record.[2,3]  Commonwealth v. Jones-Pannell, 472 Mass. 429, 431 (2015).

In the early afternoon of March 27, 2014, Vasque, Ciccarelli, and other members of the SNEU were conducting undercover surveillance in an area of Lawrence known for "a high incidence of drug activity."  The officers had made "hundreds and hundreds" of arrests for narcotics offenses in the area and knew that drug users from out of State often came to this

---

[2] As we discuss later, some of the facts found by the motion judge are clearly erroneous.  We have not included those facts in our summary.

[3] The case was tried before a different judge.

section of the city to purchase drugs.  More specifically, Vasque explained that "[o]n a day-to-day basis we deal with a number of . . . buyers that come into the city of Lawrence from out of town, New Hampshire primarily[,] looking to buy narcotics."

At one point, Ciccarelli noticed a pickup truck with a New Hampshire license plate and became suspicious.  The operator remained in his truck, which was parked, for a "few minutes" and was looking down at his lap.  Ciccarelli reported his observation about the truck to Vasque.  Both Ciccarelli and Vasque testified that the officers were in communication with each other on a separate channel used only by members of the SNEU.  The driver left the area and drove a few blocks before stopping to pick up an individual, later identified as the defendant, who had been walking down a nearby street.  Before the defendant got into the truck, the officers observed that the driver had committed a turn signal violation and also noticed that one of the truck's brake lights was out.  The operator drove for about thirty seconds to a minute and had traveled approximately three blocks before pulling over again, at which point the defendant got out and the driver immediately drove away.  The defendant then began walking down the sidewalk.  The officers did not recognize the driver or the defendant, nor did

they observe the two make an exchange of any kind.  However, based on their training and experience, which included making arrests for street-level drug transactions after observing similar scenarios unfold, they believed that a sale of drugs had taken place and formulated a plan to stop the truck and the defendant to further investigate.  According to the plan, Vasque and another officer, Detective Carmen Purpora, followed the truck, while Ciccarelli pursued the defendant.

Vasque activated the lights and siren of his vehicle and stopped the truck within a few blocks from the point where the defendant had been dropped off.  As Vasque approached, the driver stuck his arm out of the driver's side window and said, "This is it, this is all I have."  The driver, hereinafter the driver or the buyer, then handed over a "twist type bag" containing a brown substance which the officers believed to be heroin.  The driver was escorted to the back of the truck and, after waiving his Miranda rights, he stated that he had purchased a twenty-dollar bag of heroin from the Hispanic man who had gotten into and out of his truck prior to the motor vehicle stop.  Vasque then relayed this information to Ciccarelli who was "[s]omewhere in the area where the defendant was let out of the vehicle."

4

Meanwhile, at the same time Vasque (and Purpora) were stopping the truck, Ciccarelli was trailing the defendant. He first waited for the truck to pull away and "kind of get out of sight." At that point, he estimated that the defendant had walked about a block. Ciccarelli initially followed the defendant in his unmarked car and, as he shortened the distance between them, he parked in a vacant lot and continued his pursuit on foot. Ciccarelli "wanted to close the gap" between himself and the defendant and picked up his pace. He had his badge out when he approached the defendant and said, "Lawrence police, stop." The defendant did so, and immediately put his hand in his pocket. Ciccarelli reached into the same pocket and removed "plastic twists of heroin."

On the basis of these facts, and a few minor additional facts which we have not included in our summary (see note 2, supra), the judge concluded that the officers had probable cause to stop and arrest the defendant based on their collective knowledge and denied the motion to suppress. The judge reasoned as follows:

> "Although the Court finds that the officers did not have sufficient facts to support reasonable suspicion for an alleged drug transaction at the time they stopped the motor vehicle, the Court does find that the officers had a lawful basis to stop the pickup truck for the motor vehicle infractions described above. The heroin that was spontaneously surrendered by the operator to the officers as they approached his motor vehicle was properly seized.

5

The operator's post-Miranda statement to the officers concerning his heroin purchase provided the officers with probable cause to believe that the [d]efendant unlawfully distributed cocaine. Consequently, based on the information known collectively by the officers at the time, Lt. [Ciccarelli's] stop and arrest of the [d]efendant was proper. The heroin was properly seized as a result of a search incident to arrest."

"In reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of [the judge's] ultimate findings and conclusion of law" (quotation and citation omitted). Commonwealth v. Gonzalez, 487 Mass. 661, 667-668 (2021).

We first address the defendant's claim that several of the motion judge's findings of fact were clearly erroneous. A fact is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Commonwealth v. Tremblay, 480 Mass. 645, 655 n.7 (2018), quoting Building Inspector of Lancaster v. Sanderson, 372 Mass. 157, 160 (1977). The defendant argues, and the Commonwealth agrees, that there was no evidence to support the following findings of fact: (1) the buyer had been in his car looking at his lap for ten minutes before he pulled away, (2) the buyer's truck was unregistered, and (3) the right side brake light of the buyer's truck was out and the buyer failed to properly signal a left turn. Our review of the record confirms there was no evidence

6

regarding the specific amount of time the buyer was parked and looking at his lap or that the truck was unregistered, and Vasque testified only generally about the motor vehicle infractions.[4]  As it turns out, these facts were included in a police report authored by Purpora, which the defendant has provided to us in his record appendix.  The report was not admitted in evidence and Purpora did not testify at the hearing. The defendant asserts that the judge impermissibly relied on the police report to supplement his findings and further argues that doing so violated his constitutional rights to the extent that we are required to reverse the order denying his motion to suppress.

To begin with, it is not clear from the record before us that the judge had access to the police report, and even if he did, it is less than clear that the judge acted secretly in relying on the report as the defendant claims.  However, it is undisputed that the findings of fact described above were not supported by the testimony presented at the hearing and those

---

[4] There were additional discrepancies between the judge's findings of fact and the testimony presented at the hearing. For example, the judge found that Ciccarelli told the defendant to "freeze" and that he retrieved three baggies of heroin from the defendant's pocket.  Ciccarelli did not testify that he said "freeze," nor did he indicate the number of baggies he recovered from the defendant.  Although these facts are not material, they likewise have been excised from our summary of the facts.

facts are referenced within Purpora's police report.  Given

these circumstances, we conclude that these challenged findings

of fact are clearly erroneous.  The proper remedy, however, is

not to reverse the order denying the motion to suppress.

Rather, we excise those facts and do not consider them in

conducting our independent review of the judge's conclusions of

law.[5]  See Commonwealth v. Hilaire, 92 Mass. App. Ct. 784, 789-

790 (2018) (facts on which judge relied that were based on

judge's independent research are set aside and not considered in

our independent application of constitutional principles to

remaining facts).  This remedy is not only appropriate but more

than adequate where, as here and in contrast to the situation

presented in Hilaire, the challenged facts are not material.

The defendant also argues that the judge improperly found

that "the seizure of the truck precede[d] the seizure of the

---

[5] While we agree with the defendant that these findings of
fact are clearly erroneous, we do not agree that the remedy we
followed in Hilaire is inadequate.  To the contrary, there is no
basis for concluding, as the defendant asserts, that the judge
engaged in any form of subterfuge or misconduct.  We note that
defense counsel asked Vasque about the police report during her
cross-examination.  The likely scenario is the very one proposed
by the defendant, which is that the police report, a copy of
which had been attached to the complaint, was in the court's
file and the judge reviewed it at some point.  While we do not
know if this is so, even if true, there is no basis for
questioning the judge's motives or his partiality.  Nor are we
persuaded that, if the judge did in fact review the report,
doing so amounted to an ex parte communication.

8

[d]efendant."[6]  This finding of fact stands on different footing

from those discussed above.  Although it is true that there was

no specific testimony regarding the timing of the sequence of

events after the officers formulated their plan to stop both the

truck and the defendant,[7] the judge's implicit finding that the

motor vehicle stop occurred before Ciccarelli stopped the

defendant is not clearly erroneous.[8]  The testimony established

that Ciccarelli began his pursuit of the defendant after the

truck had driven out of sight and stopped the defendant after he

had already walked about a block.  Thus, even in the absence of

explicit testimony about the sequence of events, the judge's

---

[6] Specifically, the judge found that "[t]he officers seized the drugs and placed the operator under arrest."  And "[a]t the same time, Lt. Ciccarelli followed the [d]efendant as he walked away from the scene of the alleged transaction."

[7] Ciccarelli did not testify whether he was made aware of the results of the motor vehicle stop before he stopped the defendant.

[8] The absence of explicit testimony on this point is not surprising because the Commonwealth did not initially proceed on the theory that Ciccarelli could rely on information obtained by Vasque during the motor vehicle stop to establish probable cause to stop and subsequently arrest the defendant.  Rather, the Commonwealth argued that Ciccarelli had reasonable suspicion to stop the defendant based on his own observations, training, and experience, and had probable cause to search the defendant once he observed the defendant put his hand into his pocket.  The Commonwealth also argued, in the alternative, that the search of the defendant was justified under the inevitable discovery doctrine.  We note that the judge raised the issue of the collective knowledge of the officers sua sponte during an exchange with the prosecutor at the motion hearing.

implicit ruling that the truck was stopped first is adequately supported by the record.

Furthermore, the evidence established that the driver immediately handed over the heroin to Vasque.  We therefore conclude that the judge's implicit finding that Vasque had obtained the heroin before the defendant was stopped is not clearly erroneous.  Next, while we believe it is likely that the officers had obtained the driver's post-Miranda statement implicating the defendant before the defendant was stopped, whether that is so presents a much closer question and, in our view, cannot be definitively resolved on this record.  However, because we conclude that, based on the collective knowledge of the officers, probable cause to stop and arrest the defendant existed once Vasque retrieved the twist of heroin from the driver, the lack of a resolution on this point is of no consequence.

We now turn to the question whether the judge properly applied what is now referred to as the horizontal collective knowledge doctrine in determining that there was probable cause to stop, arrest, and subsequently search the defendant.[9]  The

_____

[9] There is no dispute that the defendant was seized in the constitutional sense when Ciccarelli ran up to him with his badge out and told him to stop.  See Commonwealth v. Warren, 475 Mass. 530, 534 (2016).  Accordingly, the Commonwealth bears the

10

defendant argues that the judge erred in doing so because the information known to Vasque could not be imputed to Ciccarelli and therefore the judge should not have included the information Vasque gleaned from the motor vehicle stop in the probable cause calculus. Our independent review leads us to conclude otherwise.

Recently, in Commonwealth v. Privette, 491 Mass. 501, 507-508 (2023), the Supreme Judicial Court explained that the collective knowledge doctrine (previously known as the fellow officer rule) has evolved into two different forms: horizontal collective knowledge and vertical collective knowledge. Each may be used in determining the existence of reasonable suspicion and probable cause. See id. at 508. Vertical collective knowledge, which is not at issue here, involves one officer with sufficient information directing another officer to conduct a stop or effect an arrest. See id. By contrast, horizontal collective knowledge, which the judge did apply, "permits the aggregation of information known to multiple officers." Id. More specifically, under the horizontal collective knowledge doctrine, "the officer who actually effectuates the stop need not have personal knowledge of all of the officers' pooled

---

burden of showing that reasonable suspicion or probable cause existed at that point. See id.

knowledge giving rise to reasonable suspicion or probable cause." Id. at 503. That said, as the court further explained,

> "in order to aggregate officers' knowledge for use in the determination of reasonable suspicion [or probable cause] without running afoul of art. 14, the officers must be involved in a joint investigation, with a mutual purpose and objective, and must be in close and continuous communication with each other about that shared objective."

Id. at 513. Additionally, "the officer must be aware of at least some of the critical facts and must have been in communication with others who have such knowledge." Id. at 503.

Here, the officers, all of whom were members of the SNEU, were "functioning as a team" in an active, joint undercover investigation. Privette, 491 Mass. at 514. Neither Vasque, Ciccarelli, nor other members of the SNEU acted independently. See id. As the judge found, after observing the defendant get in and then out of the truck after a short ride, the officers formulated a plan to further investigate. That plan entailed the immediate stop of both the truck and the defendant. No one deviated from the plan. Rather, the officers proceeded in a coordinated fashion and did so expeditiously. Furthermore, the officers, who had a "mutual purpose and objective," namely to investigate a potential drug transaction, were in "close and continuous communication with each other" through the use of a private radio channel used only by the SNEU. Id. at 503.

12

While it is true that it is not clear whether the information known to Vasque was communicated to Ciccarelli before the defendant was stopped, the timing of such communication is not relevant under the newly clarified horizontal collective knowledge doctrine. It is sufficient, for the purposes of applying the doctrine, that Ciccarelli was aware of some of the "critical information" giving rise to probable cause, that the officers were in continuous communication, and that Vasque had obtained information supporting probable cause before Ciccarelli effectuated the stop. Privette, 491 Mass. at 515, quoting United States v. Bernard, 623 F.2d 551, 561 (9th Cir. 1979). Here, Ciccarelli had knowledge of several critical facts based on his own observations. Indeed, it was Ciccarelli who initiated the investigation and formulated the plan to stop the truck and the defendant. And, as we have noted, the record supports the finding that Vasque had, at a minimum, obtained a twist of heroin from the driver before Ciccarelli stopped the defendant. In sum, this is not a case where there was a "post hoc" pooling of information from a number of officers to create probable cause, any one of whom had probable cause to believe a crime had been committed. Privette, supra at 516. Rather, the officers were working together pursuant to an investigative plan and sharing information in real time. In the circumstances

13

presented here, that shared information provided probable cause to believe the defendant had engaged in a drug transaction and therefore both the stop and the subsequent search and arrest of the defendant were lawful under the horizontal collective knowledge doctrine.

Given our conclusion, we need not address the Commonwealth's argument that even without the heroin obtained from the motor vehicle stop, Ciccarelli had reasonable suspicion to stop the defendant and then had probable cause to search after the defendant put his hand in his pocket. Nor is it necessary to address the Commonwealth's alternative argument that because the search of the defendant would imminently and lawfully have been made, the drugs seized from the defendant were admissible under the inevitable discovery doctrine.[10]

---

[10] As we previously explained,

"Under the inevitable discovery doctrine, if the Commonwealth can demonstrate by a preponderance standard that discovery of the evidence by lawful means was certain as a practical matter, the evidence may be admissible as long as the officers did not act in bad faith to accelerate the discovery of evidence, and the particular constitutional violation is not so severe as to require suppression" (citation omitted).

Commonwealth v. Fontaine, 84 Mass. App. Ct. 699, 709 (2014). See, e.g., Privette, 491 Mass. at 552 (Wendlandt, J., concurring) (where an officer "acts too swiftly" by stopping [or arresting] an individual, but another officer has reasonable suspicion [or probable cause] "our existing inevitable discovery doctrine permits the use of the evidence at trial as an

Expert testimony.  Prior to trial, the Commonwealth filed a motion in limine seeking to introduce expert testimony from State police Trooper Brian O'Neil, an experienced narcotics investigator who had not been involved in the investigation of the defendant, on the subject of street-level drug transactions. The motion was allowed without objection.  At trial, Trooper O'Neil testified regarding the general characteristics of drug users and dealers as well as the typical ways in which street-level drug transactions occur.  In particular, based on his training and experience, he testified that Lawrence is a "source city" for drugs and that the majority of persons purchasing drugs in Lawrence travel to the city from Maine and New Hampshire.  He further explained that drug dealers typically approach vehicles on foot and that persons purchasing drugs for personal use generally do not buy large quantities of narcotics. The defendant argues that the testimony described above constituted impermissible profile evidence and that Trooper O'Neil improperly opined on the ultimate issue of the

exception to the exclusionary rule").  See also Commonwealth v. Hernandez, 473 Mass. 379, 386-387 (2015) (even if officers acted prematurely in searching the trunk of car driven by defendant, firearm found during search would have inevitably been discovered after passenger of vehicle was identified as suspect in armed robbery).

15

defendant's guilt.[11]  Because the defendant did not object to this testimony, our review is limited to determining whether there was error and, if so, whether the error created a substantial risk of a miscarriage of justice.  See Commonwealth v. Ortiz, 50 Mass. App. Ct. 304, 307 (2000).  We discern no error.

It is well settled that "[n]arcotics investigators may testify as experts to describe how drug transactions occur on the street."  Commonwealth v. Little, 453 Mass. 766, 769 (2009).  Such testimony is "helpful to [a] jury" because it is a subject which is beyond the common knowledge of the average juror.  Commonwealth v. Miranda, 441 Mass. 783, 794 (2004), quoting Commonwealth v. Robinson, 43 Mass. App. Ct. 257, 259 (1997) ("Characteristics of two-person street-level drug transactions are beyond the common store of knowledge of the average juror").

---

[11] The defendant also challenges the testimony of the police officers who were percipient witnesses and contends that they too provided improper expert testimony.  None of these witnesses were presented as experts and none of them provided an opinion as to what had transpired between the defendant and the driver of the truck.  To the extent that any one of the three explained why their investigation focused on a truck with a New Hampshire license plate and the reasons for stopping the truck, such testimony was properly admitted to provide context for their conduct.  See Commonwealth v. Tanner, 66 Mass. App. Ct. 432, 438 (2006) (police entitled to explain motivation for conduct in carrying out investigation).  Furthermore, to the extent that testimony veered into expert testimony, it was cumulative of Trooper O'Neil's testimony.

The testimony, however, must focus on the characteristics of the crime, and not on characteristics of criminals. See Commonwealth v. Barrett, 97 Mass. App. Ct. 437, 443-444 (2020) (impermissible profile evidence focuses on characteristics of criminals, while proper expert testimony focuses on characteristics of crimes).

Contrary to the defendant's assertion, Trooper O'Neil never testified that the defendant was a drug dealer because he lived in Lawrence or because he matched the typical characteristics of a person who sells drugs. Rather, Trooper O'Neil testified about the characteristics of street-level drug crimes based on his experience. This testimony was permissible because it informed the jury as to the characteristics of the crime with which the defendant was charged and did not comment on character traits stereotypical of drug dealers. See Barrett, 97 Mass. App. Ct. at 443-444.

Next, the defendant contends that Trooper O'Neil's responses to certain questions posed by defense counsel during cross-examination crossed the boundary of proper expert testimony because it contained an assurance of guilt. The exchange at issue was prompted by a hypothetical question asked by the prosecutor as follows:

> "Hypothetically if you had a person sitting in a vehicle with a New Hampshire license plate on it, and that person

17

was manipulating something in their lap or staring down at their lap in one spot for several minutes, and then drove away down the street, picked up another person who got in the car and then drove off a couple of blocks then let that person out, do you have an opinion if this with the city of Lawrence based on that as to what that behavior is consistent with?"

The trooper answered, "My opinion would be that that behavior would be consistent with a drug transaction."  On cross-examination, defense counsel solicited additional testimony on this issue:

Q.:  "Have you ever had a situation where a person gets into a vehicle and just takes a ride, is picked up and is going for a ride, isn't that consistent with your hypothetical that you gave an opinion on a moment ago?"

A.:  "No."

Q.:  "Well, you're not suggesting that every time somebody gets in a car and just because each person has drugs on them is a drug dealer, are you?"

A.:  "Yes."

Q.:  "Every time?"

A.:  "Sure.  That's all we do, that's what we --we observe drug transactions and then we --"

Q.:  "I know that's what you do, but you're saying to this jury every time somebody gets in a car and takes a ride down the street and both people end up with drugs on them, there must've been a deal that happened in that car and not prior or at all?"

A.:  "Are we still discussing the hypothetical that I was presented with?"

Q.:  "Yes."

18

A.: "Under those circumstances, there is no I just took a ride with this guy. The purpose for that person getting in the car and driving 50 yards down the street and then getting out, was enough time to conduct a drug transaction. There is no he's a friend of mine, he just needed a ride a hundred yards down the street."

Apart from the fact that the defendant is not in a position to complain about the challenged testimony because it was elicited by defense counsel, see Commonwealth v. Elder, 389 Mass. 743, 754 (1983) (where "the defendant elicited the statement on cross-examination, he cannot now complain of its prejudicial effect"), there was no error. As he did in responding to the prosecutor's hypothetical question, Trooper O'Neil did not directly attribute the behavior that was described in the hypothetical to the defendant. He merely confirmed that the scenario presented to him was consistent with a drug transaction. Contrast Ortiz, 50 Mass. App. Ct. at 307 ("While it was certainly permissible for [the expert] to explain what function a runner performed in the street level sale of drugs, his testimony that he 'believe[d]' the defendant was a runner 'amount[ed] to a personal assurance by the witness that the crime charged had occurred, and thereby constitute[d] an improper intrusion into the fact-finding function of the jury'" [citation omitted]); Commonwealth v. Tanner, 45 Mass. App. Ct. 576, 580 (1998) (officer impermissibly blurred line between

19

expert and percipient witness by opining, "[F]rom my experience, I believed a drug transaction had taken place").

Judgments affirmed.

By the Court (Vuono, Shin & Toone, JJ.[12]),

_Paul Little_

Clerk

Entered:   September 27, 2024.

---

[12] The panelists are listed in order of seniority.